[No. B188220. Second Dist., Div. Three. Jan. 23, 2007.]

CALIFORNIA COMMERCE CASINO, INC., et al., Plaintiffs and Appellants, v.
ARNOLD SCHWARZENEGGER, as Governor, etc., et al., Defendants and Respondents.

COUNSEL

Manatt, Phelps & Phillips, Ronald B. Turovsky and Joanna S. McCallum for Plaintiffs and Appellants.

Howard Rice Nemerovski Canady Falk & Rabkin and Steven L. Mayer for Hollywood Park Land Co., LLC, et al., as Amici Curiae on behalf of Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Robert L. Mukai, Assistant Attorney General, Sara J. Drake and Kenneth R. Williams, Deputy Attorneys General, for Defendants and Respondents.

Fred J. Hiestand for the Pala Band of Mission Indians, the Pauma Band of Mission Indians, the Rumsey Band of Wintun Indians, the United Auburn Indian Community and the Viejas Band of Kumeyaay Indians as Amici Curiae on behalf of Defendants and Respondents.

OPINION

KLEIN, P. J.—Plaintiffs and appellants California Commerce Casino, Inc., and Michael Sana (collectively, plaintiffs) appeal a judgment of dismissal

following the sustaining without leave to amend of a demurrer interposed by defendants and respondents Arnold Schwarzenegger in his official capacity as Governor of the State of California, Tom Campbell in his official capacity as Director of the California Department of Finance, and California Infrastructure and Economic Development Bank (I-Bank) (defendants).

## SUMMARY STATEMENT

■ As a preliminary matter, this court has subject matter jurisdiction over the appeal. Government Code section 63048.8, subdivision (e), added by section 4 of Assembly Bill No. 687 (2003–2004 Reg. Sess.) (Assembly Bill 687), insofar as it provides for direct review by the California Supreme Court of certain matters, is unconstitutional because it abridges the Court of Appeal's appellate jurisdiction. (*In re Perris City News* (2002) 96 Cal.App.4th 1194, 1197 [118 Cal.Rptr.2d 38].)

■ The essential issue presented on appeal is the statute of limitations applicable to this action in which plaintiffs are challenging the constitutionality of Assembly Bill 687, a five-section bill wherein the Legislature ratified amended gaming compacts among the State of California and five Indian tribes. Although plaintiffs contend they are attacking solely the validity of Assembly Bill 687 and not any matters *authorized* by Assembly Bill 687, plaintiffs' action, if successful, would have the effect of invalidating the amended compacts which were ratified thereby. Therefore, the various theories raised in plaintiffs' complaint should have been tested in a validation action within 60 days of the enactment of Assembly Bill 687. (Code Civ. Proc., § 860 et seq.; Gov. Code, § 17700.) However, plaintiffs waited nearly 11 months to file suit, and therefore, the trial court properly ruled the action was time-barred.

In addition to being filed late in the trial court, the matter was not filed timely on appeal. The issue of the timeliness of the appeal is inextricably intertwined with the issue of whether this action was subject to the validation statutes. Because plaintiffs' lawsuit was subject to the time limits specified for validation actions, the time for filing notice of appeal is governed by Code of Civil Procedure section 870, within the statutory scheme pertaining to validating proceedings, *not* by California Rules of Court, former rule 2(a). Code of Civil Procedure section 870 requires notice of appeal in a validation action to be filed within 30 days of notice of entry of judgment. The notice of

appeal herein was filed 47 days after notice of entry of judgment. Therefore, the appeal must be dismissed as untimely.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The federal Indian Gaming Regulatory Act.*

The federal Indian Gaming Regulatory Act (IGRA; 25 U.S.C. § 2701 et seq.) was enacted in 1988 as a means of generating tribal government revenue and to promote triable economic development, self-sufficiency, and strong tribal governments. (25 U.S.C. § 2702.)

IGRA separates gaming into three categories and provides for different modes of regulation for each category. Class I gaming (e.g., social games for minor prizes or traditional forms of Indian gaming) (25 U.S.C. § 2703(6)) is subject to tribal regulation only. (25 U.S.C. § 2710(a)(1).) Class II gaming (e.g., bingo and similar games and card games that are allowed by a state) (25 U.S.C. § 2703(7)) is jointly regulated by federal and tribal authorities. (25 U.S.C. § 2710(a)(2).) Class III gaming, which includes all forms of gambling that are not class I gaming or class II gaming (25 U.S.C. § 2703(8)), requires a compact that is negotiated between a tribe and a state, subject to federal approval and oversight. (25 U.S.C. § 2710(d).)

2. *Pre-2000 state gaming laws and Proposition 5.*

In 1988, when the federal legislation was enacted, California prohibited all nonantique slot machines and all banking and percentage card games. (Pen. Code, § 330 et seq.)[1] California's Constitution also prohibited all lotteries except the state lottery. (Cal. Const., art. IV, § 19, subds. (a), (d).) The state Constitution also declared: "The Legislature has no power to authorize, and shall prohibit, casinos of the type currently operating in Nevada and New Jersey." (Cal. Const., art. IV, § 19, subd. (e), added by initiative, Gen. Elec. (Nov. 6, 1984).)

In 1998, the voters approved Proposition 5, which required the state to enter into specified tribal-state compacts. (Gov. Code, § 98000 et seq.)

---

[1] Banking games are those in which the house has a stake in the outcome of the game. Percentage games are those where the house collects a given share of the amount wagered. (Voter Information Guide, Primary Elec. (Mar. 7, 2000) analysis of Prop. 29 by Legis. Analyst, p. 2.)

Proposition 5 was a purely statutory measure. In 1999, the California Supreme Court held most of Proposition 5 unconstitutional because it conflicted with the constitutional ban on casino-type gambling. (*Hotel Employees & Restaurant Employees Internat. Union v. Davis* (1999) 21 Cal.4th 585, 589 [88 Cal.Rptr.2d 56, 981 P.2d 990].)

 3. *The 1999 compacts and the subsequent approval of Proposition 1A.*

On September 10, 1999, Governor Davis executed class III gaming compacts with 57 Indian tribes. (Gov. Code, § 12012.25.) The 1999 compacts allowed the tribes to operate slot machines at their casinos on Indian lands, and limited each tribe to a maximum of 2,000 slot machines.

The 1999 compacts were conditioned upon the passage of Proposition 1A, which would resolve the Supreme Court's concerns about Proposition 5 by amending the state Constitution to permit tribes to operate slot machines and banking and percentage card games pursuant to state-tribal compacts.

In March 2000, the voters approved Proposition 1A, which added the following provision to the state Constitution: "(f) Notwithstanding subdivisions (a) and (e), and any other provision of state law, the Governor is authorized to negotiate and conclude compacts, subject to ratification by the Legislature, for the operation of slot machines and for the conduct of lottery games and banking and percentage card games by federally recognized Indian tribes on Indian lands in California in accordance with federal law. Accordingly, slot machines, lottery games, and banking and percentage card games are hereby permitted to be conducted and operated on tribal lands subject to those compacts." (Cal. Const., art. IV, § 19, subd. (f).)

With the passage of Proposition 1A, the 1999 compacts finally were approved.

 4. *The 2004 compact amendments.*

On June 21, 2004, some four years after the approval of Proposition 1A, Governor Schwarzenegger and five of the tribes amended their compacts to allow the tribes, after paying substantial fee increases, to operate slot machines in excess of the previous limit of 2,000.[2] The compact amendments also provided for enhanced environmental protection and employee rights.

---

 [2] The five tribes are the Pala Band of Mission Indians, the Pauma Band of Mission Indians, the Rumsey Band of Wintun Indians, the United Auburn Indian Community, and the Viejas Band of Kumeyaay Indians (hereafter, the five tribes).

The compact amendments, inter alia, required each of the five tribes to make 18 annual payments to the state with the agreement that "it is the State's intention to assign these . . . revenue contributions totaling at least $100 million annually to a third party for purposes of securitizing the 18-year revenue stream in the form of bonds that can be issued to investors."

During the life of the bonds and in order to protect the tribes' ability to make the payments underlying the bonds, the state agreed not to authorize slot machines or banking or percentage card games within the tribes' core geographic market area, except to another Indian tribe with a valid class III gaming compact. Also, the compact amendments provided the five tribes could seek injunctive relief to enjoin the authorization of any such gaming, so as to protect the marketability of the bonds and to provide the stability in gaming operations needed to ensure the tribes' annual payments.

### 5. *Ratification of the amended compacts via Assembly Bill 687.*[3]

The Legislature ratified the amended compacts in Assembly Bill 687, which was enacted on July 1, 2004.

Assembly Bill 687 is a five-section bill. Section 3 thereof added section 12012.40 to the Government Code, which ratified the amendments of tribal-state gaming compacts entered into by the state and the five tribes.

Assembly Bill 687 was enacted as an urgency statute to take immediate effect, in order "to ensure that sufficient funds are available when needed to fund essential transportation programs and to ensure that the revenues available under the amended tribal-state compacts ratified pursuant to this act are made available to the state as expeditiously as possible . . . ." (Assem. Bill 687, § 5.)

Assembly Bill 687, among other things, approved the specific details of the bond financing arrangements by adding article 6.5 (commencing with § 63048.6) to chapter 2 of division 1 of title 6.7 of the Government Code (hereafter, article 6.5). Article 6.5 authorized the issuance of bonds securitized by the moneys paid by the five tribes to the state pursuant to the amended compacts. Assembly Bill 687 also required that any action challenging the validity of any matter *authorized by article 6.5* be brought "in accordance with, and within the time specified in" Code of Civil Procedure section 860 et seq., pertaining to validation actions. (Gov. Code, § 63048.8, subd. (d); see Code Civ. Proc., § 860 et seq.)

---

[3] Assembly Bill 687 is summarized in greater detail in part 5 of the Discussion, *post.*

### 6. *Proceedings.*

#### a. *Parties.*

Plaintiffs herein are California Commerce Casino, Inc., a nontribal gaming business entity, and Michael Sana, one of its key employees. Defendants include the Governor of California, the state Director of the Department of Finance and I-Bank. The five tribes, which enjoy sovereign immunity (see generally *Agua Caliente Band of Cahuilla Indians v. Superior Court* (2006) 40 Cal.4th 239 [52 Cal.Rptr.3d 659 148 P.3d 1126]), were not named as defendants.

#### b. *Pleadings.*

Plaintiffs filed suit in superior court on May 27, 2005, nearly 11 months after Assembly Bill 687 become effective. Six weeks later, on July 7, 2005, they filed the operative first amended complaint.

> (i) *First, second and third causes of action, alleging violation of constitutional prohibition against granting a franchise or special privilege or creating a vested right or interest by way of urgency legislation.*

In the first three causes of action, plaintiffs alleged that Assembly Bill 687 violates the constitutional provision that bars the grant of vested rights or franchises by way of an urgency measure. (Cal. Const., art. IV, § 8, subd. (d).)[4]

The first cause of action, which was denominated a petition for writ of mandate, alleged that because Assembly Bill 687 was improperly adopted as an urgency measure, defendants have a mandatory duty not to implement its provisions.

The second cause of action sought injunctive relief to prevent the implementation of Assembly Bill 687 on the ground it was unconstitutionally enacted as an urgency measure.

The third cause of action sought declaratory relief to the effect Assembly Bill 687's enactment as an urgency measure violates the California Constitution, or alternatively, a declaration that Assembly Bill 687 is subject to the

---

[4] California Constitution, article IV, section 8, subd. (d), provides: "Urgency statutes are those necessary for immediate preservation of the public peace, health, or safety. A statement of facts constituting the necessity shall be set forth in one section of the bill. In each house the section and the bill shall be passed separately, each by rollcall vote entered in the journal, two thirds of the membership concurring. *An urgency statute may not create or abolish any office or change the salary, term, or duties of any office, or grant any franchise or special privilege, or create any vested right or interest.*" (Italics added.)

right of referendum under article II, section 9(a) of the state Constitution, a right which Assembly Bill 687 attempted to circumvent.

> (ii) *Fourth, fifth and sixth causes of action, alleging Assembly Bill 687 violates Proposition 58's prohibition on borrowing to fund year-end state budget deficits.*

In the next three causes of action, plaintiffs alleged Assembly Bill 687 violates Proposition 58, a provision of the California Constitution that prohibits borrowing to fund year-end state budget deficits.[5] Plaintiffs alleged Assembly Bill 687 violates Proposition 58 because it "authorizes the issuance of up to $1.5 billion in bonds, the proceeds of which will be used almost exclusively to fund year-end state budget deficits" and because "it proposes to meet the debt obligations created by these bonds exclusively with moneys paid by the Five Tribes under the Amended Compacts-funds which are therefore 'derived from a designated source of revenue.' "

The fourth cause of action, which was denominated a petition for writ of mandate, alleged that because Assembly Bill 687 violates Proposition 58, defendants have a mandatory duty not to implement its provisions.

The fifth cause of action sought injunctive relief to prevent the implementation of Assembly Bill 687 on the ground it contravenes Proposition 58.

The sixth cause of action sought declaratory relief to the effect that Assembly Bill 687 violates Proposition 58 and is thus unconstitutional.

> (iii) *Seventh, eighth and ninth causes of action, alleging Assembly Bill 687 unconstitutionally contracts away the state's police power to regulate gaming.*

In the final three causes of action, plaintiffs alleged Assembly Bill 687 unconstitutionally attempts to contract away the state's police power to regulate gaming for the next 18 years until the bonds are repaid.

The seventh cause of action, which was denominated a petition for writ of mandate, alleged that because Assembly Bill 687 unconstitutionally contracts away the state's police power, defendants have a mandatory duty not to implement it.

---

[5] Proposition 58, the California Balanced Budget Act, added article XVI, section 1.3 to the state Constitution. Said provision states in relevant part: "[T]he State may not obtain moneys to fund a year-end state budget deficit, as may be defined by statute, pursuant to any of the following: . . . (2) a debt obligation under which funds to repay that obligation are derived solely from a designated source of revenue . . . ." (Cal. Const., art. XVI, § 1.3, subd. (c), operative Mar. 3, 2004.)

The eighth cause of action sought injunctive relief on the same ground.

The ninth cause of action sought declaratory relief to the effect that Assembly Bill 687 is unconstitutional because it purports to contract away the state's police power.

### c. *Demurrer.*

Defendants demurred on two grounds: The complaint failed to state a viable claim in that it was filed after the 60-day statute of limitations allowed to challenge bond-related contracts and financing arrangements; and the complaint failed to name, and because of sovereign immunity is unable to name, the five affected tribes as necessary parties to the action.

### d. *Trial court's ruling.*

On November 4, 2005, the trial court issued an order sustaining the demurrer to the first amended complaint without leave to amend, ruling the pleading was time-barred by the applicable 60-day statute of limitations. The trial court reasoned, "Since Plaintiffs' [first amended complaint] challenges the validity of matters authorized by AB 687, despite their opposition arguments to the contrary . . . , it is subject to the requirements of [Code Civ. Proc.,] § 860 et seq."

The trial court also held the "[pleading] failed, and because of sovereign immunity, is not able to name the five affected tribes as necessary and indispensable parties to this case."

A judgment of dismissal was entered on November 4, 2005. On December 21, 2005, plaintiffs filed notice of appeal.

### CONTENTIONS

Plaintiffs contend the trial court erred in dismissing the action as time-barred, and that it abused its discretion in concluding the five tribes are necessary and indispensable parties.[6]

Defendants seek dismissal of the appeal as untimely. They further argue that in any event, the trial court properly dismissed the action because the

---

[6] Hollywood Park Land Company, LLC, Terrence E. Fancher, MEC Land Holdings (California), Inc., Santa Anita Companies, Inc., Los Alamitos Race Course and Bay Meadows Main Track Investors, LLC, have filed an amicus curiae brief in support of plaintiffs.

complaint is barred by the 60-day statute of limitations and due to plaintiffs' failure to join the five tribes as indispensable parties.[7]

## DISCUSSION

1. *This court has subject matter jurisdiction over the appeal; Government Code 63048.8, subdivision (e), purporting to abridge this court's appellate jurisdiction, is unconstitutional.*

Before discussing the parties' contentions, we address a threshold question as to subject matter jurisdiction.

Section 4 of Assembly Bill 687 contains its own provision pertaining to appellate procedures. Section 4 of Assembly Bill 687 added, inter alia, Government Code section 63048.8 which states in relevant part at subdivision (e): "Notwithstanding any other provision of law, *the exclusive means to obtain review of a superior court judgment entered in an action brought pursuant to Chapter 9 (commencing with Section 860) of Title 10 of Part 2 of the Code of Civil Procedure to determine the validity of any bonds to be issued, any other contracts to be entered into, or any other matters authorized by this article shall be by petition to the Supreme Court for writ of review. Any such petition shall be filed within 15 days following the notice of entry of the superior court judgment,* and no extension of that period shall be allowed. If no petition is filed within the time allowed for this purpose, or the petition is denied, with or without opinion, the decision of the superior court shall be final and enforceable as provided in subdivision (a) of Section 870 of the Code of Civil Procedure." (Italics added.)

██ This provision, abridging the Court of Appeal's appellate jurisdiction, is patently unconstitutional.[8] As explained in *In re Perris City News, supra,* 96 Cal.App.4th at page 1197: "The jurisdiction of the various levels of appellate courts within California is defined by the California Constitution. The Constitution provides that the Supreme Court has appellate jurisdiction only 'when judgment of death has been pronounced' (Cal. Const., art. VI, § 11), when it transfers a case to itself from the Court of Appeal (*id.,* § 12, subd. (a)), or when it reviews a decision of the Court of Appeal (*id.,* § 12, subd. (b)). With those exceptions, 'courts of appeal have appellate jurisdiction when superior courts have original jurisdiction . . . .' (*Id.,* § 11, subd. (a).) [¶] . . .

---

[7] The five tribes jointly have filed an amicus curiae brief in support of defendants.

[8] The Attorney General makes no attempt to uphold the constitutionality of Government Code section 63048.8, subdivision (e).

[¶] Once appellate jurisdiction has been conferred by the Constitution, it cannot be destroyed or abridged by legislative action. (*Powers v. City of Richmond* (1995) 10 Cal.4th 85, 108 [40 Cal.Rptr.2d 839, 893 P.2d 1160].) Any attempt to do so is void. (*In re Sutter-Butte By-Pass Assessment* (1923) 190 Cal. 532, 536 [213 P. 974].)"

 Therefore, Government Code section 63048.8, subdivision (e), providing for direct review by the California Supreme Court, is unconstitutional. In accordance with the principle that "courts of appeal have appellate jurisdiction when superior courts have original jurisdiction" (Cal. Const., art. VI, § 11, subd. (a)), this court has subject matter jurisdiction to review the judgment of the superior court herein.

> 2. *Plaintiffs' appeal is governed by validation statutes; therefore, plaintiffs' notice of appeal was untimely, requiring dismissal.*

Having declared unconstitutional Government Code section 63048.8, subdivision (e), providing for petition for writ of review to the Supreme Court within 15 days, the issue remains whether the appeal is timely.

The judgment of dismissal was entered on November 4, 2005, and the clerk served notice of entry of judgment that same day. Plaintiffs filed notice of appeal 47 days later, on December 21, 2005.

On June 9, 2006, defendants filed a motion to dismiss the appeal, contending this action is governed by the validation statutes and therefore the notice of appeal, filed more than 30 days after notice of entry of judgment, is untimely. (Code Civ. Proc., § 870.)[9] The issue of the timeliness of the appeal is inextricably intertwined with the issue of whether this action was subject to the validation statutes. Therefore, *this court deferred ruling on the dismissal motion pending consideration of the merits of the appeal.*

 In order to determine the timeliness of the notice of appeal, we must determine whether the underlying action was governed by the statutory scheme pertaining to validation proceedings. (*Kaatz v. City of Seaside* (2006)

---

[9] The time for appealing a judgment in a validation action is governed by Code of Civil Procedure section 870, not by California Rules of Court, former rule 2(a), or the current rule, rule 8.104 (eff. Jan. 1, 2007). Code of Civil Procedure section 870 provides in relevant part at subdivision (b): "Notwithstanding any other provision of law including, without limitation, Section 901 and any rule of court, no appeal shall be allowed from any judgment entered pursuant to this chapter unless a notice of appeal is filed within 30 days after the notice of entry of the judgment . . . ."

143 Cal.App.4th 13, 27 [49 Cal.Rptr.3d 95] (*Kaatz*).)[10] This requires us to resolve the principal issue of the appeal itself. (143 Cal.App.4th at p. 27.) A contrary approach would preclude review on the merits of a trial court decision by having the appellate court assume the applicability of a statute providing for a shortened appeal period without regard to whether that assumption is correct. Therefore, we must consider whether plaintiffs' action was, in fact, subject to the validation statutes. (*Ibid.*)

We indicate in advance the balance of our decision by summarily noting our conclusion that because plaintiffs' various constitutional challenges to Assembly Bill 687, if successful, would have invalidated the compacts, said challenges should have been asserted in a validation action. Therefore, the 30-day appeal period under Code of Civil Procedure section 870, subdivision (b) is applicable. Consequently, the appeal must be dismissed as untimely.[11]

### 3. *Standard of appellate review.*

In determining whether a plaintiff has properly stated a claim for relief, "our standard of review is clear: ' "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed." [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff.' [Citations.]" (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126 [119 Cal.Rptr.2d 709, 45 P.3d 1171].) Our review is de novo. (*Ibid.*)

### 4. *The nature and purpose of validation actions.*

The procedures applicable to validation actions are set forth at Code of Civil Procedure section 860 et seq.

---

[10] In *Kaatz*, the city's conduct challenged by Kaatz was *not* subject to the validation statutes and therefore the 30-day appeal period under Code of Civil Procedure section 870, subdivision (b), was inapplicable. (*Kaatz, supra*, 143 Cal.App.4th at p. 27.)

[11] Although the appeal must be dismissed as untimely, this is the rare case in which, notwithstanding the dismissal of the appeal, the appellants have received a plenary review of the merits of their contentions.

■ Code of Civil Procedure section 860 enables a *public agency* to bring a validation action "upon the existence of any matter which under any other law is authorized to be determined pursuant to this chapter, *and for 60 days thereafter . . . .*" (Italics added.)

"If no proceedings have been brought by the public agency pursuant to this chapter, *any interested person* may bring an action within the time and in the court specified by Section 860 to determine the validity of such matter." (Code Civ. Proc., § 863, italics added.)[12]

■ Under the statutory scheme, "an agency may indirectly but effectively 'validate' its action *by doing nothing to validate it*; unless an 'interested person' brings an action of his own under section 863 within the 60-day period, the agency's action will become immune from attack whether it is legally valid or not." (*City of Ontario v. Superior Court* (1970) 2 Cal.3d 335, 341–342 [85 Cal.Rptr. 149, 466 P.2d 693] (*Ontario*); accord, *Friedland v. City of Long Beach* (1998) 62 Cal.App.4th 835, 851 [73 Cal.Rptr.2d 427] (*Friedland*); *Embarcadero Mun. Improvement Dist. v. County of Santa Barbara* (2001) 88 Cal.App.4th 781, 792 [107 Cal.Rptr.2d 6].) As to matters "which have been or which could have been adjudicated in a validation action, such matters—including constitutional challenges—must be raised within the statutory limitations period in section 860 et seq. or they are waived." (*Friedland, supra*, at pp. 846–847.)

■ We recognize the statutory period of limitation for commencing a validation action is extremely short but it is not unique in its brevity. (See, e.g., Elec. Code, § 16401 [time for filing statement of election contest].) "What constitutes a reasonable time is a question ordinarily left to the Legislature, whose decision a court will not overrule except where palpable error has been committed. [Citation.]" (*Friedland, supra*, 62 Cal.App.4th at p. 846.) Given the policies underlying the validation statutes, including the need to limit the extent to which delay due to litigation may impair a public agency's ability to operate financially, the 60-day limitations period for filing a validation action (Code Civ. Proc., § 860) is not unreasonable. (62 Cal.App.4th at pp. 843, 846.)[13]

■ A validation action implements important policy considerations. " '[A] central theme in the validating procedures is speedy determination of

---

[12] The initiation of a validation proceeding by an interested person is referred to as a " 'reverse validation action.' " (*Kaatz, supra*, 143 Cal.App.4th at p. 30, fn. 16.)

[13] Plaintiffs do not contend the 60-day statute of limitations for bringing a validation action (Code Civ. Proc., § 860) is unreasonable. Rather, they contend their action was not subject to the validation statutes.

the validity of the public agency's action.' [Citation.] 'The text of [Code of Civil Procedure] section 870 and cases which have interpreted the validation statutes have placed great importance on the need for a single dispositive final judgment.' [Citation.] The validating statutes should be construed so as to uphold their purpose, i.e., 'the acting agency's need to settle promptly all questions about the validity of its action.' [Citation.] [¶] . . . [¶] A key objective of a validation action is to limit the extent to which delay due to litigation may impair a public agency's ability to operate financially. [Citation.]" (*Friedland, supra*, 62 Cal.App.4th at pp. 842–843.) A validation action also serves to fulfill the important objective of "facilitat[ing] a public agency's financial transactions with third parties by quickly affirming their legality." (*Id.* at p. 843.) In particular, " '[t]he fact that litigation may be pending or forthcoming drastically affects the marketability of public bonds[.]' " (*Id.* at p. 843.)

 5. *Overview of the five sections which comprise Assembly Bill 687.*

Assembly Bill 687, which ratified amendments of tribal-state compacts entered into by the State of California and the five tribes, consists of five sections.

Section 1 of Assembly Bill 687 sets forth the Legislature's findings and statement of purpose and declares, inter alia: "It is in the public interest and a matter of urgency to authorize, and to implement as soon as possible, the sale of the right to receive those payments and a portion of certain other payments under the compacts, and the issuance of the bonds by the purchaser of the assets, in order to ensure that funds will be available for the purpose of funding essential transportation improvements and projects in the state."

Section 2 of Assembly Bill 687 added section 1811 to the Code of Civil Procedure to enable the five tribes to seek a preliminary and permanent injunction against any gambling that violates their exclusive right to conduct class III gaming. This statute also provides no undertaking shall be required on the part of the tribes in connection with any action to seek a preliminary or permanent injunction. (Code Civ. Proc., § 1181, subd. (a).)

Section 3 of Assembly Bill 687 added section 12012.40 to the Government Code. Government Code section 12012.40 ratifies the amendments of tribal-state gaming compacts entered into by the state and the five tribes, and provides that specified acts and agreements related to the amended compacts are not projects for the purposes of the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.).

Section 4 of Assembly Bill 687 added article 6.5 to chapter 2 of division 1 of title 6.7 to the Government Code. Article 6.5, consisting of Government Code section 63048.6 et seq., is captioned "Tribal Compact Assets Securitization."[14] This article authorizes I-Bank (established by Gov. Code, § 63021) to sell, on behalf of the state, some or all of the state's compact assets to a special purpose trust, and empowers the trust to issue bonds securitized by the moneys paid by the five tribes to the state pursuant to the amended compacts. The portion of the compact assets to be sold "shall be an amount . . . necessary to provide the state with net proceeds of the sale, not to exceed one billion five hundred million dollars . . . ." (Gov. Code, § 63048.65, subd. (a).) With respect to the net proceeds, the largest share, some $1.2 billion, was to be deposited to the Traffic Congestion Relief Fund. (Gov. Code, § 63048.65, subd. (c)(1).)[15]

Article 6.5, within section 4 of Assembly Bill 687, also includes the following provision: "(d) The special purpose trust and the bank shall be treated as public agencies for purposes of Chapter 9 (commencing with Section 860) of Title 10 of Part 2 of the Code of Civil Procedure, *and any action or proceeding challenging the validity of any matter authorized by this article* shall be brought in accordance with, and within the time specified in, that chapter." (Gov. Code, § 63048.8, subd. (d), italics added.)

Article 6.5 also states "This article and all powers granted hereby shall be liberally construed to effectuate its intent and their purposes." (Gov. Code, § 63048.9.)

The final section of Assembly Bill 687, namely, section 5, declares the bill is an "urgency statute necessary for the immediate preservation of the public peace, health, or safety within the meaning of Article IV of the Constitution and shall go into immediate effect. The facts constituting the necessity are: [¶] In order to ensure that sufficient funds are available when needed to fund essential transportation programs and to ensure that the revenues available under the amended tribal-state compacts ratified pursuant to this act are made available to the state as expeditiously as possible, it is necessary that this act take effect immediately."

---

[14] "Compact assets" are defined as moneys required to be paid to the state under specified provisions of the designated tribal compacts, and the state's rights to receive those payments. (Gov. Code, § 63048.6, subd. (a).)

[15] Thus, the contracts in issue here, namely, the compacts, involve financing and financial obligations of the state. Public agency contracts involving financing and financial obligations are frequently the subject of validation actions. (*Friedland, supra,* 62 Cal.App.4th at p. 843.)

6. *Pertinent statutes requiring and authorizing validation actions to challenge the amended compacts or various matters authorized by Assembly Bill 687.*

 The validation statutes, i.e., Code of Civil Procedure section 860 et seq., do not specify the matters to which they apply. Rather, they apply to *"any matter which under any other law is authorized to be determined pursuant to this chapter . . . ."* (Code Civ. Proc., § 860, italics added; accord, *Planning & Conservation League v. Department of Water Resources* (1998) 17 Cal.4th 264, 269 [70 Cal.Rptr.2d 635, 949 P.2d 488].) Therefore, we look to other statutes and cases that have interpreted them to determine the scope of public agency actions that are subject to validation under the validation statutes. (*Kaatz, supra,* 143 Cal.App.4th at p. 31.)

Here, there are two statutes which provide for validation actions to challenge the validity of the amended compacts or the validity of certain matters authorized by Assembly Bill 687, namely, Government Code section 63048.8, subdivision (d), and Government Code section 17700.

a. *The validation provision in section 4 of Assembly Bill 687.*

Government Code section 63048.8, subdivision (d), added by section 4 of Assembly Bill 687 or article 6.5, specifically provides: "The special purpose trust and the bank shall be treated as public agencies for purposes of Chapter 9 (commencing with Section 860) of Title 10 of Part 2 of the Code of Civil Procedure, and *any action or proceeding challenging the validity of any matter authorized by this article* [i.e., article 6.5] shall be brought in accordance with, and within the time specified in, that chapter." (Gov. Code, § 63048.8 , subd. (d), italics added.)

 By its terms, said provision is limited in its scope. Only challenges to "matter[s] authorized by this article" (Gov. Code, § 63048.8, subd. (d)), which article relates to securitization of tribal compact assets, are subject to the validation provision contained in section 4 of Assembly Bill 687. The amended compacts were ratified by section 3 of Assembly Bill 687, not by section 4 thereof. Therefore, a challenge to the validity of the amended compacts would not be governed by the validation requirement of section 4 of Assembly Bill 687.

b. *The validation provision of Government Code section 17700.*

Leaving aside the limited scope of the validation provision found in section 4 of Assembly Bill 687, there is a much broader validation provision which is pertinent here. Government Code section 17700 (added by Stats. 1994,

ch. 242, § 2, p. 1832), which preceded the enactment of Assembly Bill 687, provides in relevant part at subdivision (a): "The state or any state board, department, agency, or authority, . . . *may bring an action to determine the validity of its* bonds, warrants, *contracts*, obligations, or evidences of indebtedness pursuant to Chapter 9 (commencing with Section 860) of Title 10 of Part 2 of the Code of Civil Procedure." (Italics added.) As noted, where a public agency may bring a validation action under Code of Civil Procedure section 860, any interested person may bring a reverse validation action within the same 60-day period. (Code Civ. Proc., § 863; *Kaatz, supra*, 143 Cal.App.4th at p. 30, fn. 16.)

> 7. *The type of contracts subject to validation under Government Code section 17700.*

Although Government Code section 17700 provides for validation of "contracts" without limitation or qualification, the parties recognize that not all contracts are subject to validation under said statute.

> a. *The* Ontario *decision construing the type of contracts subject to validating proceedings.*

Due to the dearth of authority construing Government Code section 17700, which authorizes validating proceedings to determine the validity of state contracts, we begin our analysis with the Supreme Court's extensive discussion of the validation statutes in *Ontario, supra*, 2 Cal.3d 335. The *Ontario* decision construed Government Code section 53511, which authorizes a *local agency* to bring an action "to determine the validity of its bonds, warrants, *contracts*, obligations or evidences of indebtedness pursuant to [Code of Civil Procedure section 860 et seq.]." (Gov. Code, § 53511, italics added.)

■ The quoted language from Government Code. section 53511 is germane because it is identical to the pertinent language in Government Code section 17700. "It is a well-recognized rule of construction that after the courts have construed the meaning of any particular word, or expression, and the legislature subsequently undertakes to use these exact words in the same connection, the presumption is almost irresistible that it used them in the precise and technical sense which had been placed upon them by the courts." (*City of Long Beach v. Payne* (1935) 3 Cal.2d 184, 191 [44 P.2d 305].)

In view of the fact the Legislature enacted Government Code section 17700 using the same language which *Ontario* construed, and in particular, its interpretation of the term "contracts," the Legislature is presumed to have been aware of and to have concurred in the judicial construction. (See *Marina Point, Ltd. v. Wolfson* (1982) 30 Cal.3d 721, 734 [180 Cal.Rptr. 496, 640 P.2d 115]; *Kaatz, supra*, 143 Cal.App.4th at p. 41.)

In *Ontario* taxpayers challenged a city's plan for the financing of an automobile racing stadium that included (1) the issuance and sale, without voter approval, of $25.5 million in mortgage bonds to finance the project, (2) the award of a contract to a private party, without competitive bidding, for the construction of the stadium at a cost of $12.5 million, and (3) the lease of the stadium for 50 years to a for-profit entity that would operate the facility as a private business venture. (*Ontario, supra,* 2 Cal.3d at p. 338.)

The plaintiffs' essential claims were that the plan promoted a private commercial enterprise without any public benefit and was an unconstitutional gift of public funds. (*Ontario, supra,* 2 Cal.3d at pp. 338–339.) After filing an answer, the city moved to dismiss the complaint on the ground the plaintiffs failed to comply with particular requirements pertaining to summons under the validation statutes. (*Id.* at p. 339.) The trial court denied the motion, impliedly finding the plaintiffs' claims were governed by the validation statutes but expressly holding the plaintiffs had shown good cause to excuse their failure to comply with the special summons requirements. (*Ibid.*)

The city sought a writ of prohibition, contending the trial court had abused its discretion in denying the motion to dismiss, a position the Supreme Court rejected. (*Ontario, supra,* 2 Cal.3d at pp. 345–348.) In the course of determining the trial court acted within its discretion, *Ontario* provided an extensive discussion of the validation statutes.[16]

*Ontario* stated: "Code of Civil Procedure sections 860 to 870 . . . were first enacted in 1961. The legislation was proposed by the Judicial Council, which explained that it had been 'concerned for some years with the numerous statutes providing periods within which appeals may be taken at variance with the time for notice of appeal contained in the Rules on Appeal.' [Citation.] In particular, the Council pointed to numerous scattered statutes authorizing actions by cities, counties, and public agencies to establish the

---

[16] We agree with *Kaatz* as to the significance of *Ontario.* "Although it questioned the applicability of the validation statutes as to each one of the plaintiffs' claims, [*Ontario*] did not conclude definitively that the public agency conduct about which the plaintiffs complained was (or was not) subject to validating proceedings. (*City of Ontario, supra,* 2 Cal.3d at p. 346.) [*Ontario's*] review of the validation statutes and Government Code section 53511 led it to conclude that whether [section 860 through 870] applied to the plaintiffs' case 'present[ed] a "complex and debatable" issue' (*City of Ontario, supra,* 2 Cal.3d at p. 345), thereby supporting the plaintiffs' contention that there was good cause for their noncompliance with the summons requirements of the validation statutes. Thus, while *City of Ontario's* lengthy discussion concerning the scope of the validation statutes and the meaning of the term 'contracts' in Government Code section 53511 may be considered dictum, we agree with the appellate court's statement in *Smith v. Mt. Diablo Unified Sch. Dist.* [(1976)] 56 Cal.App.3d [412,] 418 [128 Cal.Rptr. 572]: 'Although not controlling, the dicta [of our Supreme Court in *City of Ontario*] is entitled to substantial weight, particularly in view of its thoroughness.' [Citation.]" (*Kaatz, supra,* 143 Cal.App.4th at p. 34, fn. 25.)

validity of their bonds or assessments or the legality of their existence, and providing special procedures for appeals in such cases . . . ." (*Ontario, supra,* 2 Cal.3d at p. 340.)

The *Ontario* court continued, noting that Government Code sections 53510 and 53511 were enacted in 1963, two years after the enactment of Code of Civil Procedure section 860 et seq. (*Ontario, supra,* 2 Cal.3d at p. 341.) The city therein argued the use of the word "contracts" in Government Code section 53511 indicated the validation statutes applied to *any* public agency contract. (*Ontario, supra,* at p. 341.) While conceding the challenged stadium agreement facially appeared to be embraced by Government Code section 53511 because there was "no limitation or qualification on the word 'contracts' " (*Ontario, supra,* at p. 343), the Supreme Court did not end its inquiry there.

Instead, *Ontario* concluded a closer examination of Government Code section 53511 suggested a much narrower construction of "contracts" for at least four reasons: "First, the Legislative Counsel's digest . . . characterized the measure as one allowing 'a local agency to bring an action to determine the validity of evidences of indebtedness.' Second, section 53511 was enacted as part of chapter 3 of part 1, division 2, title 5, of the Government Code. Chapter 3 is entitled 'Bonds,' and deals exclusively with the power of local agencies to sell their bonds, replace defaced or lost bonds, and pledge their revenues to pay or secure such bonds. If [Government Code] section 53511 [were] intended to be a provision of general application, logically it should have been placed in article 4 ('Miscellaneous') of chapter 1 ('General') of the same part, in which a group of such unrelated matters are collected. Third, the key language of [Government Code] section 53511—'bonds, warrants, contracts, obligations or evidences of indebtedness'—was taken directly from [Code of Civil Procedure] section 864 of Chapter 9; under well-known canons of statutory interpretation, it should ordinarily be given the same meaning as it had in the earlier statute. But as a perusal of the companion 1961 legislation reveals, when chapter 9 was adopted it was made applicable only to such matters as the legality of the local entity's existence, the validity of its bonds and assessments, and the validity of joint financing agreements with other agencies. If [Government Code] section 53511 was intended to reach any and all contracts into which an agency may lawfully enter, the restricted language of [Code of Civil Procedure] section 864 was inappropriate for that purpose. Finally, that language is peculiarly inapt for expressing such a general meaning in any event, as it lists the word 'contracts' in the midst of four other terms which all deal with the limited topic of a local agency's financial obligations." (*Ontario, supra,* 2 Cal.3d at pp. 343–344.)

*Ontario* also observed: "If, as the City here argues, the word 'contracts' in [Government Code] section 53511 is taken to mean *any* contract into which

the agency may lawfully enter, the far-reaching expansion of the statute becomes apparent. The vast majority of such an agency's dealings are necessarily undertaken by means of contracts; some involve routine ministerial matters, but others embody important policy decisions affecting the public at large. [¶] . . . [¶] . . . [I]f the City's construction of the word 'contract' is correct, virtually every taxpayer has become an 'interested person' with regard to virtually every action of a local public agency. It is unreasonable to assume that the members of such a large and amorphous group are likely to have prompt notice of each agency action affecting them. Yet whether such a person has such notice or not, he is given only 60 days in which (1) to discover the existence, scope and effect of the agency's action, (2) to reach a conclusion as to its validity, (3) to determine whether the agency has instituted a validating proceeding or imminently intends to do so, and (4) if not, to prepare and file a proceeding of his own. In an age of increasingly complex government, this seems a heavy burden to impose on the vigilant taxpayer." (*Ontario, supra*, 2 Cal.3d at pp. 341–342.)

> b. Graydon v. Pasadena Redevelopment Agency *(1980) 104 Cal.App.3d 631 [164 Cal.Rptr. 56]* (Graydon*).*

*Graydon* is also instructive. There, the Pasadena Redevelopment Agency (Agency) entered into an agreement with a developer for the development of a retail shopping center. To finance the public cost of the retail shopping center development for acquisition of land, demolition of buildings, relocation of residents and businesses, and construction of parking facilities, the Agency sold tax allocation bonds in the principal amount of approximately $58 million. On November 2, 1977, the Agency's governing body awarded and authorized execution of a negotiated contract for construction of the subterranean garage for the project. (*Graydon, supra*, 104 Cal.App.3d at p. 634.)

Less than three months later, Graydon, the plaintiff, filed a petition for mandamus alleging, inter alia, the contract for the construction of the subterranean garage for the retail center was awarded without competitive bidding in violation of provisions of the Health and Safety Code. The answers asserted, inter alia, the action was barred because it was not filed within the time prescribed by Code of Civil Procedure section 860 et seq. (*Graydon, supra*, 104 Cal.App.3d at pp. 634–635.) The trial court denied Graydon's petition for writ of mandate, ruling that in light of the Agency's statutory purpose to eliminate blight, the Agency's ability " 'to operate and accomplish its statutory purpose and the purposes of the [redevelopment plan] would be substantially impaired unless the contract . . . is subject to a prompt validation procedure.' " (*Id.* at p. 639, italics omitted.)

The reviewing court agreed. It reasoned: *"The negotiated contract for the construction of the subterranean garage is an integral part of the whole method of financing the public costs associated with the retail center.* The financing is by bonds issued by the Agency to be paid from tax increments allocated to the Agency. The record indicates that if completion of the retail center was delayed beyond March 1, 1980, because of delay in commencement of construction, a loss of tax increment revenue of $1,556,000 would result for the 1981–1982 fiscal year. . . . *The ability of the Agency to pay its bonds, dependent in large part upon the flow of tax increment monies resulting from the completion of the retail center, was thus directly linked to the award of the questioned contract.* [¶] . . . *The contract is inextricably bound to the Agency's financial obligations. . . . These bonds were intimately and inextricably bound up with the award of this contract.* Delay in the completion of the retail center because of the delay which would inevitably have resulted if the contract had been competitively bid . . . would have had a direct bearing on the financial ability of Agency to meet its financial obligations and statutory purpose. [¶] These conclusions compel the result we reach here. *The lack of a prompt validating procedure would impair this public agency's ability to operate and carry out its statutory purpose.* We hold that chapter 9 of title 10 of part 2 of the Code of Civil Procedure (commencing with § 860) applies and that this action, which was not commenced until January 26, 1978, more than 60 days after the contract came into existence on November 2, 1977, is barred by the 60-day limitation provisions of sections 860 and 863." (*Graydon, supra*, 104 Cal.App.3d at pp. 645–646, italics added.)

### c. *The recent decision in* Kaatz.

Unlike *Graydon*, the matter in issue in *Kaatz* was *not* the proper subject of a validation proceeding because it did not involve a challenge, either direct or indirect, to a public financing arrangement. (*Kaatz, supra*, 143 Cal.App.4th at p. 45.)

In *Kaatz*, Benjamin Kaatz brought suit as a taxpayer to challenge certain actions of the City of Seaside arising out of its purchase and sale of 105 acres of residential property that were formerly part of the Fort Ord military base. Kaatz alleged, inter alia, that immediately after the city purchased the property from the United States Army in July 2002, it conveyed the entire acreage to a developer, K & B Bakewell, for a fraction of its fair market value. Following motions for judgment on the pleadings and for dismissal filed by K & B Bakewell, joined in by the city, the suit was dismissed on the basis that it was time-barred. (*Kaatz, supra*, 143 Cal.App.4th at p. 19.)

The lower court concluded the challenged purchase and sale of property were matters that were embraced by Government Code section 53511's

language permitting a local agency to bring a proceeding under the validation statutes to " 'determine the validity of its bonds, warrants, contracts, obligations or evidences of indebtedness,' and . . . Kaatz had not filed suit to determine the validity of the City's actions within 60 days as required by the validation statutes." (*Kaatz, supra,* 143 Cal.App.4th at p. 19.)

The appellate court reversed, holding that "based upon the limited scope of the validation statutes, that the City's conveyance of the property—along with the City's prior execution of the underlying contract with the developer concerning the potential acquisition and sale of the property—was not subject to validation. We . . . therefore find that the trial court erred in its application of the 60-day statute of limitations for validation proceedings and consequent dismissal of the action." (*Kaatz, supra,* 143 Cal.App.4th at p. 20.)

Guided by *Ontario* and other authorities, *Kaatz* found "[i]t is therefore clear that 'contracts' under Government Code section 53511 should be assigned a restricted meaning. Rather than authorizing proceedings to validate any public agency contract—or even any contract constituting a financial obligation of a public agency [fn. omitted]—the 'contracts' under Government Code 53511 *are only those that are in the nature of, or directly relate to a public agency's bonds, warrants or other evidences of indebtedness.*" (*Kaatz, supra,* 143 Cal.App.4th at p. 42, italics added.)

The *Kaatz* court was unpersuaded by the authorities cited by the respondents therein, stating: "For instance, in *Graydon, supra,* 104 Cal.App.3d at page 634—which K&B Bakewell claimed at oral argument to be the principal case supporting its position—the Pasadena Redevelopment Agency sold approximately $58 million in tax allocation bonds to finance the public cost of a retail shopping development . . . . The *Graydon* plaintiffs challenged a component of that project, namely, the award and execution by the agency of a contract . . . for construction of the subterranean garage, claiming that it was illegal because it was awarded without competitive bidding. [Citation.] The appellate court held that the action was subject to the validation statutes because, while it may not have been a direct challenge to the agency's issuance of bonds to fund the project, the subterranean garage contract was 'an integral part of the whole method of financing the public costs associated with the retail center. The financing is by bonds issued by the Agency.' [Citation.] *Thus, the public agency action being challenged indirectly in Graydon was a public financing arrangement:* 'These bonds were intimately and inextricably bound up with the award of this contract [to construct the subterranean garage].' [Citation.] *The case before us involves no such challenge (direct or indirect) to a public financing arrangement.*" (*Kaatz, supra,* 143 Cal.App.4th at p. 45, italics added.)

█ Guided by *Ontario* and its progeny, we conclude contracts subject to validation under Government Code section 17700 are those that are in the

nature of, or directly relate to the state or a state agency's bonds, warrants, or other evidences of indebtedness. (See *Kaatz, supra,* 143 Cal.App.4th at p. 42 [discussing Gov. Code, § 53511].) We now turn to the three theories pled by plaintiffs in their attempt to invalidate Assembly Bill 687, and by extension, the amended compacts.

8. *All three theories pled by plaintiffs alleging Assembly Bill 687 violates various provisions of the California Constitution were an attack on the validity of the amended compacts (contracts) and therefore should have been raised in a reverse validation action within 60 days of Assembly Bill 687's ratification of the amended compacts.*

a. *Because the amended compacts are inextricably intertwined with the intended use of the income stream created by them and with bonds to be issued, the lack of a prompt validating procedure to validate the compacts would frustrate the statutory purpose of Assembly Bill 687.*

The amended compacts are, in the words of *Graydon,* "inextricably bound up" with the use of the income stream created by the amended compacts and with the bonds to be issued. (*Graydon, supra,* 104 Cal.App.3d at p. 646.) The terms of the amended compacts confirm this fact.

Section 4.3.3 of the amended compacts provides in relevant part: "(a) The Tribe shall make annual payments to the State of $5.75 million . . . for 18 years . . . . The Tribe understands that it is the State's intention to assign these and other tribes' revenue contributions totaling at least $100 million annually to a third party for purposes of securitizing the 18-year revenue stream in the form of bonds that can be issued to investors." Further, section 3.2(e) of the amended compacts provides: "In the event the bonds securitized in part by the Tribe's annual payments referenced in Section 4.3.3, subdivision (a) are not issued or following the conclusion of the Tribe's annual payments securitizing the issued bonds, the Tribe shall be relieved of its obligation to make the payments specified in [various sections], if and only if any person or entity other than an Indian tribe with a federally authorized compact engages in any Gaming Activities specified in subdivision (a) of Section 4.1 of this Amended Compact within the Tribe's core geographic market, until such time that such gaming ceases."

Thus, the amended compacts are inextricably intertwined with the state's intended use of the income stream created by them and with the bonds to be issued at a later date. Therefore, the ability of the five tribes and the state to accomplish the statutory purpose of Assembly Bill 687 "would be substantially impaired absent a prompt validating procedure as to such contract[s]." (*Graydon, supra,* 104 Cal.App.3d at p. 645.) That is because the negotiated

amended compacts are an "integral part of the whole method of financing" (*ibid.*) the state's "transportation programs and [are needed] to ensure that the revenues available under the amended tribal-state compacts ratified pursuant to [Assembly Bill 687] are made available to the state as expeditiously as possible . . . ." (Assem. Bill 687, § 5.)

As defendants point out, the application of the validation statutes is not contingent on whether the bonds are ultimately issued at the end of the process. The applicability of the validation statutes is determined at the beginning of the financing process when the contracts—in this case the amended compacts—required to implement that process are approved.

> b. *Plaintiffs' theories that Assembly Bill 687 was improperly enacted on an urgency basis and that it unconstitutionally contracts away the police power are an attack on the validity of the compacts and therefore should have been tested in a prompt validation action.*

In the first, second and third causes of action, plaintiffs alleged Assembly Bill 687 is unconstitutional because it grants a franchise or special privilege or creates a vested right or interest by way of urgency legislation. This challenge to the validity of Assembly Bill 687 is at the same time a challenge to the validity of the amended compacts. In the event plaintiffs were to prevail on their request for mandamus, injunctive or declaratory relief on the theory Assembly Bill 687's enactment as an urgency statute renders it unconstitutional, the amended compacts, which were ratified by Assembly Bill 687, would be invalidated.

The same analysis applies to the seventh, eighth and ninth causes of action, wherein plaintiffs alleged Assembly Bill 687 unconstitutionally contracts away the state's police power to regulate gaming. Said challenge to the validity of Assembly Bill 687 is at the same time a challenge to the validity of the amended compacts. In the event plaintiffs were to prevail on their request for mandamus, injunctive or declaratory relief on this theory, the now ratified amended compacts would be invalidated.

 Therefore, both of these alleged infirmities in the amended compacts should have been tested in a timely reverse validation action. The amended compacts between the state and the five tribes are contracts. Government Code section 17700 authorizes the filing of a validation action (or reverse validation action) to determine the validity of a state contract, in accordance with Code of Civil Procedure section 860 et seq. Code of Civil Procedure section 864 provides "contracts . . . shall be deemed to be in existence upon their authorization" and "contracts shall be deemed authorized as of the date of

adoption by the governing body of the public agency of a resolution or ordinance approving the contract and authorizing its execution." Here, the amended compacts came into existence on July 1, 2004, the date Assembly Bill 687 took effect.

Consequently, plaintiffs could and should have brought a reverse validation action within 60 days of the July 1, 2004 ratification of the amended compacts (Code Civ. Proc., §§ 860, 863) to challenge their validity on the theories that Assembly Bill 687 unconstitutionally ratified them on an urgency basis and that Assembly Bill 687 unconstitutionally contracted away the police power. Having failed to raise these constitutional challenges to the validity of the amended compacts in a timely reverse validation action, these theories are now barred. To reiterate, as to matters "which have been or which could have been adjudicated in a validation action, such matters— including *constitutional challenges*—must be raised within the statutory limitations period in section 860 et seq. or they are waived." (*Friedland, supra,* 62 Cal.App.4th at pp. 846–847, italics added.)

> c. *Plaintiffs' that theory Assembly Bill 687 violates Proposition 58's prohibition on borrowing to fund year-end state budget deficits also should have been raised in a reverse validation action.*

Plaintiffs' remaining theory, which was the subject of the fourth, fifth and sixth causes of action, is that Assembly Bill 687 violates Proposition 58's prohibition on borrowing to fund year-end state budget deficits. Plaintiffs alleged Assembly Bill 687 violates Proposition 58 because it "authorizes the issuance of up to $1.5 billion in bonds, the proceeds of which will be used almost exclusively to fund year-end state budget deficits" and because "it proposes to meet the debt obligations created by these bonds exclusively with moneys paid by the Five Tribes under the Amended Compacts—funds which are therefore 'derived from a designated source of revenue.' "

Plaintiffs' attack on Assembly Bill 687 as violative of Proposition 58 is at the same time an attack on the validity of the amended compacts because they are, in the words of *Graydon,* "inextricably bound up" with the use of the income stream created by the amended compacts and with the bonds to be issued. (*Graydon, supra,* 104 Cal.App.3d at p. 646.) As indicated, the amended compacts express, inter alia, "the State's intention to assign [the] . . . tribes' revenue contributions totaling at least $100 million annually to a third party for purposes of securitizing the 18-year revenue stream in the form of bonds that can be issued to investors."

Consequently, the amended compacts are inextricably intertwined with the state's intended use of the income stream created by the amended compacts

and with the bonds to be issued at a later date. Plaintiffs' claim that Assembly Bill 687 contravenes Proposition 58 is also an attack on the validity of the amended compacts on this basis; plaintiffs had 60 days to raise this challenge to the compacts in a reverse validation action.

In sum, all three theories raised in plaintiffs' complaint were properly the subject of a timely reverse validation action which plaintiffs failed to bring within 60 days of Assembly Bill 687's ratification of the amended compacts. (Gov. Code, § 17700; Code Civ. Proc., §§ 860, 863, 864.)[17]

We are mindful that the trial court, in ruling the plaintiffs were required to bring a validation action within 60 days of the enactment of Assembly Bill 687, based its decision on section 4 of Assembly Bill 687, which added article 6.5, and specifically Government Code section 63048.8, subdivision (d). As discussed, we conclude said section is limited in scope in that it applies only to actions challenging the validity of "any matter authorized by this article," i.e., article 6.5. (Gov. Code, § 63048.8, subd. (d).) Unlike the trial court, we conclude the controlling section is Government Code section 17700, which required plaintiffs to bring a timely reverse validation action pursuant to Code of Civil Procedure section 860 et seq. in order to challenge the validity of the amended compacts. However, because the trial court's decision is correct in result, it must be upheld. (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 19 [112 Cal.Rptr. 786, 520 P.2d 10].)

9. *Remaining issues not reached.*

In view of our conclusion the trial court properly held the entire complaint is barred by the 60-day statute of limitations applicable to validating proceedings (Code Civ. Proc., §§ 860, 863), it is unnecessary to address the trial court's ruling that the five tribes are necessary and indispensable parties to this case.

We also express no opinion as to any litigation involving the validity of any bonds issued pursuant to article 6.5, within section 4 of Assembly Bill 687. We simply hold plaintiffs' various constitutional challenges to Assembly Bill 687 were also an attack on the validity of the amended compacts, and therefore said challenges should have been brought within 60 days of the effective date of said compacts.

---

[17] We note IGRA provides for approval of tribal-state compacts by the federal Secretary of Interior. (25 U.S.C. § 2710(d)(8).) Accordingly, the amended compacts specify they would not become effective until ratified by statute in accordance with state law *and* publication of notice of approval in the Federal Register as provided in IGRA. Notice of approval was published in the Federal Register on September 2, 2004. (69 Fed.Reg. 53733 (2004).) Even assuming the 60-day period for bringing a reverse validation action began to run on September 2, 2004, rather than on July 1, 2004, the complaint filed May 27, 2005, is untimely. (Code Civ. Proc., § 860 et seq.)

## DISPOSITION

The appeal is dismissed as untimely. (Code Civ. Proc., § 870, subd. (b).) The parties shall bear their respective costs on appeal.

Croskey, J., and Aldrich, J., concurred.

A petition for a rehearing was denied February 22, 2007, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied May 9, 2007, S150681.