Filed 8/16/16 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| SANTA CLARITA ORGANIZATION FOR PLANNING AND THE ENVIRONMENT,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>CASTAIC LAKE WATER AGENCY et al.,<br><br>    Defendants and Respondents. | B264284<br><br>(Los Angeles County Super. Ct. No. BS141673)<br><br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>NO CHANGE IN JUDGMENT |

THE COURT:*

It is ordered that the opinion filed herein on July 28, 2016, be modified as follows:

1.  On page 15, footnote 4 is deleted, which will require renumbering of all subsequent footnotes.

2.  On page 15, the first full paragraph, line 3, the word "audiotape" is changed to "videotapes" so the sentence reads:

> Before undertaking substantial evidence review, we first address SCOPE's argument that our analysis should include four items of evidence that the trial court refused to consider—namely, the raw videotapes and uncertified transcripts, prepared by SCOPE members, from the Agency's board's December 12 and December 19 meetings.

---

\*      ASHMANN-GERST, Acting P.J., CHAVEZ, J., HOFFSTADT, J.

1

3.  The paragraph beginning at the bottom of page 16 with "SCOPE contends" and ending on page 17 with "(*Outfitter Properties*, at p. 251.)" is modified to read as follows:

> SCOPE offers three reasons why, in its view, the general rule against the consideration of extra-record evidence does not apply here.  SCOPE argues that the general rule does not apply when a party is challenging an agency's action as ultra vires (that is, beyond its statutory authority), but the law is to the contrary because courts will limit themselves to record evidence even when confronted with challenges that an agency "acting in its quasi-legislative capacity has exceeded its authority." (*Shapell*, *supra*, 1 Cal.App.4th at p. 233.)  SCOPE next argues that *Outfitter Properties*, *supra*, 207 Cal.App.4th 237 supports its position, but the exceptions detailed above in *Outfitter Properties* do not make "extra-record evidence . . . admissible to contradict evidence upon which the administrative agency relied in making its quasi-legislative decision." (*Id.* at p. 251.)  SCOPE lastly asserts for the first time at oral argument on appeal that it is attacking not only the Agency's initial acquisition of Valencia, but also its ongoing operation of Valencia as its alter ego.  SCOPE urges that the latter challenge is not subject to the general rule against resort to extra-record evidence.  Even if we assume SCOPE is correct, ignore that SCOPE has forfeited this argument by waiting until oral argument on appeal to raise it (*Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 232, fn. 6), and overlook that SCOPE's operative complaint primarily attacks the Agency's acquisition of Valencia, SCOPE's newly minted argument does it little good because the trial court had an independent basis for excluding the extra-record evidence, as we discuss next.

4.  On page 17, after the newly-inserted text described in modification number 3 above, footnote 4 should be inserted after the final line "as we discuss next."  The text of footnote 4 should read:

> To the extent that SCOPE at oral argument on appeal requested a reversal and remand so that it can propound discovery and obtain new extra-record evidence to prove that the Agency is *now* operating Valencia as its alter ego, we deny that request as untimely and as wholly inconsistent with an earlier stipulation not to "propound any further request for discovery in this matter."  SCOPE asserts that it had tactical reasons for entering into this stipulation, but its motives do not negate the effect of its acts.

5.  On page 17, first full paragraph, line 2, the words "audio tapes" are changed to "videotapes" so the sentence reads:

Second, even if the trial court could have considered this extra-record evidence, the court acted within its discretion in deciding not to admit the incomplete videotapes and their uncertified transcripts.

6. On page 17, first full paragraph, line 10, the words "audio tapes" are changed to "videotapes" so the sentence reads:

In this case, the court had evidence that at least one of the videotapes was incomplete, and that both transcripts were uncertified.

7. On page 17, second full paragraph, line 4, the word "audio" is changed to "video" so the sentence reads:

SCOPE argues that the Agency did not comply with its discovery obligations before the trial court, did not properly respond to a Public Records Act request (Gov. Code, § 6250 et seq.), and did not inform SCOPE that its board's secretary regularly video taped meetings to use in preparing official minutes.

There is no change in the judgment.

Appellant's petition for rehearing is denied.

**CERTIFIED FOR PUBLICATION.**

Filed 7/28/16 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| SANTA CLARITA ORGANIZATION FOR PLANNING AND THE ENVIRONMENT,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CASTAIC LAKE WATER AGENCY et al.,<br><br>Defendants and Respondents. | B264284<br><br>(Los Angeles County Super. Ct. No. BS141673) |

APPEAL from judgments of the Superior Court of Los Angeles County. Luis A. Lavin, Judge. Robert H. O'Brien, Judge. Affirmed.

Advocates for the Environment, Dean Wallraff, for Petitioner and Appellant.

Kronick, Moskovitz, Tiedemann & Girard, Eric N. Robinson and Hanspeter Walter; Morrison & Foerster, Miriam A. Vogel, for Defendants and Respondents Newhall Land and Farming Company and Stevenson Ranch Venture, LLC.

Ferguson Case Orr Paterson, Neal P. Maguire, for Defendant and Respondent Valencia Water Company.

Best, Best & Krieger, Jeffrey V. Dunn and Russell G. Behrens; Greines, Martin, Stein & Richland, Timothy T. Coates, for Defendant and Respondent Castaic Lake Water Agency.

\* \* \* \* \* \*

1

This is a lawsuit to unwind a public water agency's acquisition of all of the stock of a retail water purveyor within its territory. On appeal of the trial court's order refusing to unwind the transaction, we confront three questions: (1) must we dismiss the appeal as untimely under the streamlined procedures available for validating certain acts of public agencies (Code Civ. Proc., § 860 et seq.) when those procedures were invoked below, but invoked improperly because the underlying acts fall outside the reach of the validation statutes?; (2) has the purveyor become the agency's alter ego by virtue of the agency's ownership of all of its stock and its appointment of a majority of the purveyor's directors, such that the agency is now engaged in the retail sale of water in violation of Water Code section 12944.7?; and (3) does the agency's ownership of the purveyor's stock violate article XVI, section 17 of the California Constitution, which precludes a public agency from "loan[ing] its credit," and from "subscrib[ing] to, or be[ing] interested in the stock of any company, association, or corporation" *except* the "shares of . . . a mutual water company or corporation" acquired to "furnish[] a supply of water for public, municipal or governmental purposes?"

We conclude that the answer to all three questions is no. The validation procedures invoke a court's in rem jurisdiction, and that subject matter jurisdiction attaches only if there is a statutory basis for invoking those procedures and proper notice; because that basis is absent here and because estoppel does not apply to subject matter jurisdiction, the validation procedures' accelerated timeline for appeal is inapplicable. There is substantial evidence to support the trial court's factual finding that the purveyor did not become the agency's alter ego in this case. The agency did not violate article XVI, section 17 for two reasons—namely, the provision reaches only stock acquisitions that extend credit and the provision's exception for stock ownership applies to any "mutual water company" and any other "corporation" (whether or not it is a mutual water company). Thus, the fact that the corporate purveyor in this case was not a mutual water company is of no significance.

We accordingly affirm.

FACTS AND PROCEDURAL BACKGROUND

## I. Facts

Respondent Castaic Lake Water Agency (Agency) is charged with "acquir[ing] water and water rights" in order to "provide, sell and deliver that water at wholesale, for municipal, industrial, domestic, and other purposes" within its territory. (Stats. 1986, ch. 832, § 5, p. 2843, Deering's Ann. Wat.—Uncod. Acts (2008 ed.) Act 130, § 15.)[1] Its territory encompasses most of the Santa Clarita Valley. (*Id.*, § 2.) Initially, the Agency sold its water wholesale to four retail "purveyors"—Santa Clarita Water District, respondent Valencia Water Company (Valencia), Newhall County Water District, and Los Angeles County Waterworks District No. 36. In 1999, the Agency acquired the stock of the Santa Clarita Water District and absorbed the district into its own operations. (*Klajic v. Castaic Lake Water Agency* (2001) 90 Cal.App.4th 987, 991-992 (*Klajic I*); *Klajic Lake Water Agency* (2004) 121 Cal.App.4th 5, 11 (*Klajic II*).) The California Legislature passed Assembly Bill 134 to allow the Agency *itself* to act as a retail purveyor of water in the territory where the Santa Clarita Water District used to operate. (Act 130, § 15.1; *Klajic II*, at pp. 9-13.)

In 2011, respondent Newhall Land and Farming Company (Newhall) owned 100 percent of the stock in Valencia, and offered to sell that stock to the Agency. At that time, Valencia was a private corporation regulated by the California Public Utilities Commission. The Agency was interested in Newhall's offer because acquiring Valencia would give the Agency control over 84 percent of the retail connections within its territory, which was consistent with the Agency's "One Valley One Water" mission statement and would enable the Agency to "realize economies of scale and synergies associated with [an] integrated [Santa Clarita Water District]/[Valencia] retail entity." Agency staff began negotiating with Newhall on a strictly confidential basis. On December 10, 2012, Agency staff informed the Agency's board of directors (board) that

---

[1] Uncodified water agency enactments are collected in appendices of the annotated Water Codes, and are assigned numerical designations by the publisher.

the Agency and Newhall had reached a proposed agreement for the Agency to acquire Valencia's stock for $73.8 million.

On December 12, 2012, the Agency held a special meeting at which its board adopted two resolutions. Resolution No. 2890 was a resolution of necessity declaring that "[t]he public interest and necessity require the acquisition of all issued and outstanding shares of [Valencia]." This acquisition, the resolution stated, would enable the Agency to "maintain[] and enhanc[e] the reliability of retail and wholesale water service within the Agency's boundaries," to "develop[] more uniform water service policies within the Santa Clarita Valley," to "better coordinate groundwater management and enhance Valley wide conjunctive use of all [Valley resources] of supply," and to "provide potential future opportunities for operational efficiencies and capital improvement economies of scale." The resolution specifically ratified the prior negotiations of Agency staff with Newhall concerning Valencia and authorized the Agency to file an eminent domain lawsuit to acquire the stock. Resolution No. 2893, adopted in closed session, authorized Agency staff to enter into a settlement agreement of $73.8 million.

The next day, the Agency filed its eminent domain lawsuit. Five days later, it filed its settlement agreement with Newhall. Under that agreement, the Agency was to purchase all outstanding shares of Valencia's stock for $73.8 million. Except that all of Valencia's directors were required to resign, the Agency was to continue operating Valencia under Public Utility Commission supervision and without altering Valencia's water rights or its personnel for the later of 75 days or the conclusion of any litigation challenging the acquisition. The Agency also agreed that *should* it or Valencia decide to merge Valencia into the Agency, the Agency would forestall implementation for 75 days after any board resolution authorizing such an action.

The trial court approved the settlement and entered judgment on the eminent domain action on December 18, 2012. The next day, on December 19, 2012, the Agency held another meeting. At that meeting, the Agency's staff recommended five persons to be appointed to Valencia's five-member board; three of them were Agency employees.

4

## II.     Procedural History

The Santa Clarita Organization for Planning and the Environment (SCOPE) sued the Agency and its board; Valencia and its board of directors; Newhall; Stevenson Ranch Venture LLC, a company affiliated with Newhall; and Keith Abercrombie (Abercrombie), Valencia's general manager and a member of the Agency's board during the negotiations between Agency Staff and Newhall.  In the operative first amended petition, SCOPE brought claims:  (1) for inverse validation (Code Civ. Proc., § 863); (2) for writ of mandate (*id.*, § 1085); (3) for violations of the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.); (4) for illegal expenditure of taxpayer funds (Code Civ. Proc., § 526a); and (5) for conflict of interest (Gov. Code, §§ 1090 & 87100).  To perfect its invocation of the validation procedures underlying the first count, SCOPE sought and obtained court permission to give constructive notice in one of the local newspapers, and thereafter filed proof of serving that notice.

The trial court subsequently sustained a demurrer with leave to amend on SCOPE's CEQA claim due to untimeliness, and granted judgment on the pleadings to Abercrombie on the sole claim against him for conflict of interest.[2]

In March 2015, the trial court issued a written ruling on SCOPE's remaining claims.

The trial court denied SCOPE's claims for invalidation and for a writ of mandate. In so doing, the court rejected SCOPE's argument that Valencia had become the Agency's alter ego, finding that the Agency's ownership of all of Valencia's stock and its appointment of a majority of its directors did not constitute sufficient evidence of merger or fraud.  In reaching this conclusion, the court refused to consider a video tape and uncertified transcript, prepared by SCOPE, of the December 12 and December 19 Agency board meetings because they had a "very weak foundation."  The court further concluded that the Agency did not violate article XVI, section 17 in acquiring Valencia's

---

[2]     We affirmed the ruling as to Abercrombie in *Santa Clarita Organization for Planning & the Environment v. Abercrombie* (2015) 240 Cal.App.4th 300.

5

stock. The court reasoned that the provision's exception for owning stock in a "mutual water company or corporation" for the purpose of furnishing water for the public "indicates that there is more than one category of entities in which the state can obtain capital stock. One category is a mutual water company. The other is a corporation, without any limitations as to form or composition." The court rejected SCOPE's argument that the phrase meant "mutual water company or *mutual water* corporation" because doing so "would render the word 'corporation' meaningless because, by definition, a mutual water company includes a corporation providing water to its members at cost." The court found the legislative history of the provision unhelpful because it did "not answer the question of why the word[s] 'or corporation' [were] inserted into the actual amendment."

The court also rejected SCOPE's claim based on the improper use of taxpayer funds.

The trial court entered judgment on all of SCOPE's claims, including the validation claim, on April 8, 2015. SCOPE was served with notice of this judgment on April 13, 2015.

Thirty-eight days later, on May 21, 2015, SCOPE filed its notice of appeal.

**DISCUSSION**

SCOPE does not appeal the trial court's rulings on its claims alleging taxpayer waste, conflict of interest or violations of CEQA. Instead, it contends that the court erred in denying its writ of mandate claim because the Agency's acquisition of Valencia is unlawful no matter what: If Valencia is the Agency's alter ego, the Agency is violating Water Code section 12944.7 by engaging in the retail sale of water; and if Valencia is not the Agency's alter ego, the Agency's purchase, ownership of its stock, and operation of Valencia as a wholly-owned subsidiary is violating article XVI, section 17 of the California Constitution. The first question requires us to evaluate the court's factual finding that Valencia is not the Agency's alter ego, and we review that finding for substantial evidence. (*Las Palmas Associates v. Las Palmas Center Assocs.* (1991) 235 Cal.App.3d 1220, 1248 (*Las Palmas Associates*); *Klajic I*, *supra*, 90 Cal.App.4th at

6

p. 1001.)  The second question requires us to interpret the language of article XVI, section 17, which is a question of law we review de novo.  (*Greene v. Marin County Flood Control & Water Conservation Dist.* (2010) 49 Cal.4th 277, 287; *Rubalcava v. Martinez* (2007) 158 Cal.App.4th 563, 570.)

Before reaching these issues, we confront a threshold procedural question raised by Newhall, Stevenson Ranch, Valencia and the Agency (collectively, respondents) in a motion to dismiss this appeal:  Is this appeal timely?

## I.    Appellate Jurisdiction

Respondents contend that SCOPE's appeal is untimely.  SCOPE filed its notice of appeal 38 days after it was served with notice of the judgment.  Although this is timely under the general, 60-day window for filing notices of appeal (Cal. Rules of Court, rule 8.104(a)(1)(A)), respondents assert that the 30-day window applicable to validation proceedings governs (Code Civ. Proc., § 870, subd. (b)).  Respondents make two arguments in this regard:  (1) that SCOPE's lawsuit is a validation proceeding because the validation statutes (*id.*, § 860 et seq.) reach SCOPE's challenge to the Agency's actions; or (2) even if they do not, SCOPE treated its lawsuit as a validation proceeding before the trial court and is precluded from changing its position now.

### A.    *Is SCOPE's lawsuit a validation proceeding?*

Validation proceedings are a procedural "vehicle" for obtaining an expedited but definitive ruling regarding the validity or invalidity of certain actions taken by public agencies.  (Code Civ. Proc., § 860 et seq.; *Fontana Redevelopment Agency v. Torres* (2007) 153 Cal.App.4th 902, 911 (*Fontana*).)  They are expedited because they require validation proceedings to be filed within 60 days of the public agency's action (Code Civ. Proc., §§ 860 & 863); they are "given preference over all other civil actions" (*id.*, § 867); and, most pertinent here, any appeal must be filed within 30 days after notice of entry of judgment (*id.*, § 870, subd. (b)).  They are definitive because they are in rem proceedings that, once proper constructive notice is given (*id.*, §§ 861 & 862), result in a judgment that is "binding . . . against the world" (*Planning & Conservation League v. Department of Water Resources* (2000) 83 Cal.App.4th 892, 921; *Bonander v. Town of*

7

*Tiburon* (2009) 46 Cal.4th 646, 659 (*Bonander*), and cannot be collaterally attacked, even on constitutional grounds (*Colonies Partners, L.P. v. Superior Court* (2015) 239 Cal.App.4th 689, 694 (*Colonies Partners*); *Friedland v. City of Long Beach* (1998) 62 Cal.App.4th 835, 846 (*Friedland*)).  By providing a protocol for obtaining a "prompt" "settle[ment]" of "'"all questions about the validity of its action"'"" (*California Commerce Casino, Inc. v. Schwarzenegger* (2007) 146 Cal.App.4th 1406, 1421 (*California Commerce Casino*), quoting *Friedland*, at p. 843)), validation proceedings provide much-needed certainty to the agency itself as well as to all third parties who would be hesitant to contract with or provide financing to the agency absent that certainty.  (*Hills for Everyone v. Local Agency Formation Com.* (1980) 105 Cal.App.3d 461, 467 (*Hills for Everyone*) [noting how agency needs to "settle . . . questions"]; *Macy v. City of Fontana* (2016) 244 Cal.App.4th 1421, 1433 [same]; *Kaatz v. City of Seaside* (2006) 143 Cal.App.4th 13, 47 (*Kaatz*) [validation removes impediments to third parties contracting with agencies]; *Friedland*, at p. 843 [validation "facilitate(s) a public agency's financial transactions with third parties by quickly affirming their legality"].)

Validation proceedings can be initiated by the public agency itself (Code Civ. Proc., § 860), or by "any interested person" in a so-called "inverse" or "reverse" validation proceeding (*id.*, § 863).  Although reverse validation proceedings appear at first blush to be optional (*ibid.* [providing that "any interested person *may* bring an action"], italics added), they are not:  Section 869 "'says [the interested person] *must*'" bring the inverse validation action "'or be forever barred from contesting the validity of the agency's action in a court of law.'"  (*Kaatz, supra*, 143 Cal.App.4th at p. 30, quoting *City of Ontario v. Superior Court* (1970) 2 Cal.3d 335, 341 (*City of Ontario*); *Friedland, supra*, 62 Cal.App.4th at pp. 846-847 ["as to matters which have been or which could have been adjudicated in a validation action, such matters—including constitutional challenges—must be raised within the statutory limitations period . . . or they are waived"]; Code Civ. Proc., § 869 ["[n]o contest except by the public agency or its officer or agent of any thing or matter under this chapter shall be made other than within the time and the manner herein specified"].)  As a result, "'an agency may indirectly but

8

effectively "validate" its action *by doing nothing to validate it.*'" (*California Commerce Casino*, *supra*, 146 Cal.App.4th at p. 1420, quoting *City of Ontario*, at pp. 341-342.)

Of course, "not all actions of a public agency are subject to validation." (*Kaatz*, *supra*, 143 Cal.App.4th at p. 19.) The statutes defining validation proceedings do not specify the types of public agency action to which they apply; instead, they "establish[] a uniform system that other statutory schemes must activate by reference." (*Bonander*, *supra*, 46 Cal.4th at p. 659; Code Civ. Proc., § 860 ["[a] public agency may upon the existence of any matter *which under any other law is authorized to be determined pursuant to this chapter . . .* bring an action"], italics added.) At last count, more than 200 statutes scattered throughout the California Codes are subject to validation in validation proceedings. (*Kaatz*, *supra*, 143 Cal.App.4th at p. 31, fn. 19.)

Under most of the statutes declaring certain acts of public agencies subject to validation proceedings, what matters is the "nature of the governmental action being challenged." (*Hills for Everyone*, *supra*, 105 Cal.App.3d at p. 468; *McLeod v. Vista Unified School Dist.* (2008) 158 Cal.App.4th 1156, 1165 (*McLeod*) [looking to "'[t]he gravamen of a complaint'"].) The applicability of validation proceedings does not turn on the type of relief demanded. (*McLeod*, at p. 1165.) Nor does it turn on the "form of the action." (*Ibid.*) Thus, where a certain type of action is subject to validation proceedings, a third party cannot sidestep those proceedings by purporting to invoke a different procedural vehicle, such as a writ of mandate (Code Civ. Proc., § 1085) or a taxpayer suit (*id.*, § 526a). (See *Millbrae School Dist. v. Superior Court* (1989) 209 Cal.App.3d 1494, 1499 [suit seeking a writ of mandate subject to validation proceedings]; *Project Agricultural Land v. Stanislaus County Local Agency* (2014) 223 Cal.App.4th 550, 558 [same]; *McLeod*, at pp. 1166-1167 [suit seeking relief under Code of Civil Procedure section 526a subject to validation proceedings]; *Regus v. City of Baldwin Park* (1977) 70 Cal.App.3d 968, 972 [same]; *Plunkett v. City of Lakewood* (1975) 44 Cal.App.3d 344, 346-347 [same].) Any other rule would render the certainty attaching to validation proceedings meaningless. (See *Millbrae School Dist.*, at p. 1499.) Whether the substantive basis of the challenge to the public agency's action matters

9

seems to turn on whether the statute invoking the validation proceedings conditions that invocation on the nature of the challenge. (Compare *Hills for Everyone*, at p. 468 ["the basis for the challenge" does not matter] with *McLeod*, at p. 1165 ["the nature of the right sued upon" does matter].)

In this case, SCOPE's operative complaint alleged that three statutes made the Agency's acquisition of Valencia subject to validation proceedings: (1) section 19 of the Agency's enabling act; (2) section 16.1 of the Agency's enabling act; and (3) Government code section 53511. No others have been offered on appeal, so we focus on those three. We conclude that none of them applies to the Agency's acts in filing its eminent domain action against Newhall or in resolving that action through a settlement agreement.

Section 19 of the Agency's enabling act applies to "[a]n action to determine the validity of any bonds, warrants, promissory notes, contracts, or other evidences of indebtedness of the kinds authorized by subdivision (h), (i), (o), (p), (r) or (s) of Section 15." (Stats. 1986, ch. 832, § 5, p. 2843, Deering's Ann. Wat.—Uncod. Acts (2008 ed.) Act 130, § 19.) The Agency's acts here rest upon its power to sue and to exercise the power of eminent domain, as well as its power to enter into contracts to acquire "a waterworks system, water rights, waters, [and] lands"; these powers are authorized by subdivisions (b), (g), and (e) of section 15, respectively. The subdivisions of section 15 covered by section 19 deal with issuing bonds and borrowing money (*Id.*, § 15, subd. (h)); issuing promissory notes (*id.*, subd. (i)); joining with other public agencies or private corporations "for the purpose of financing . . . acquisitions, constructions, and operations" (*id.*, subd. (o)); issuing bonds for payments to the state (*id.*, subd. (p)); "construct[ing], operat[ing] or maintain[ing] works to develop hydroelectric energy" (*id.*, subd. (r)); and "contract[ing] . . . for the sale of the right to use falling water for electric energy purposes" (*id.*, subd. (s)). The Agency's acts in this case do not deal with these subdivisions, and thus fall outside of section's 19 reference to validation proceedings.

10

Section 16.1 of the Agency's enabling act provides that the Agency's retail sale of water within the area once serviced by the Santa Clarita Water District is governed by division 12 of the Water Code (Stats. 1986, ch. 832, § 5, p. 2843, Deering's Ann. Wat.— Uncod. Acts (2008 ed.) Act 130, § 16.1), and division 12 makes validation proceedings applicable "to determine the validity of an assessment, or of warrants, contracts, obligations, or evidence of indebtedness" (Wat. Code, § 30066). Because the parties in this case have specifically stipulated that Valencia operates outside the boundaries of the Santa Clarita Water District, section 16.1 by its terms does not apply to the Agency's acquisition of Valencia.

Government Code section 53511 makes validation proceedings available "to determine the validity of [a local agency's] bonds, warrants, *contracts*, obligations or evidences of indebtedness." (Gov. Code, § 53511, subd. (a), italics added.) Although "contracts" could be read to reach *all* contracts, the courts have defined it by reference to the clause in which it has been used, and thus to reach only those contracts "that are in the nature of, or directly relate to a public agency's bonds, warrants or other evidences of indebtedness." (*Kaatz*, *supra*, 143 Cal.App.4th at pp. 40, 42; *Friedland*, *supra*, 62 Cal.App.4th at p. 843 ["[t]he 'contracts' in this statute do not refer generally to all public agency contracts, but rather to contracts involving financing and financial obligations"]; *Meaney v. Sacramento Housing & Redevelopment Agency* (1993) 13 Cal.App.4th 566, 577; see generally *City of Ontario*, *supra*, 2 Cal.3d at pp. 343-345 [setting forth this reasoning, but declining to adopt it definitively]; accord, *Phillips v. Seely* (1974) 43 Cal.App.3d 104, 109-111 [declining to apply section 53511 to contract for legal services]; *Walters v. County of Plumas* (1976) 61 Cal.App.3d 460, 468-469 [declining to apply section 53511 to franchise contract].) At times, courts have read section 53511 also to reach contracts that are "'inextricably bound up'" with an agency's bonds, warrants or other evidence of indebtedness, even if those contracts do not directly deal with those topics. (*California Commerce Casino*, *supra*, 146 Cal.App.4th at p. 1430; *McLeod*, *supra*, 158 Cal.App.4th at pp. 1169-1170; see *Graydon v. Pasadena Redevelopment Agency* (1980) 104 Cal.App.3d 631, 645-646.) In this case, the Agency's

11

settlement contract to acquire Valencia's stock did not deal with bonds, warrants or other evidence of indebtedness and was not inextricably bound up with other contracts that did; instead, the Agency purchased Valencia's stock using "cash on hand."

SCOPE's action was therefore not subject to validation proceedings.

### B.     Is SCOPE precluded from contesting the applicability of the validation procedures because it invoked them below?

Respondents assert that it is too late for SCOPE to disavow that the validation proceedings' deadlines apply here because (1) collateral attacks on validation proceedings are not permitted, and (2) the doctrine of judicial estoppel applies.[3] We are unpersuaded.

### 1.     Is this appeal a collateral attack?

Although, as noted above, a final validation judgment cannot be collaterally attacked (*Colonies Partners*, *supra*, 239 Cal.App.4th at p. 694), the propriety of validation proceedings may be challenged on direct appeal (*Fontana*, *supra*, 153 Cal.App.4th at pp. 908-909.)  Newhall suggests that the applicability of the validation statutes can only be contested on direct appeal if the appeal challenging them was filed in accordance with the validation statutes, but that precise argument was rejected in *Kaatz*, *supra*, 143 Cal.App.4th at page 26.

### 2.     Does judicial estoppel apply?

The doctrine of judicial estoppel prevents a party from taking inconsistent positions during litigation.  (*AP-Colton LLC v. Ohaeri* (2015) 240 Cal.App.4th 500, 507; *Law Offices of Ian Herzog v. Law Offices of Joseph M. Fredrics* (1998) 61 Cal.App.4th 672, 678-679.)  A party's prior position cannot preclude it from contesting a trial court's subject matter jurisdiction, but can preclude a party from arguing that the court is acting

---

[3]     Respondents cite several cases regarding how a party's consent to a judgment precludes a later challenge (e.g., *Browand v. Scott Lumber Co.* (1954) 125 Cal.App.2d 68, 72-73; *Dietrichson v. Western Loan & Bldg. Co.* (1932) 123 Cal.App. 358, 361-362), but the doctrine of consent is irrelevant because SCOPE did not consent to the entry of judgment against it.

"'in excess of [its] jurisdiction.'" (*Simmons v. Ghaderi* (2008) 44 Cal.4th 570, 584; *Sullivan v. Delta Air Lines, Inc.* (1997) 15 Cal.4th 288, 307, fn. 9.) Because SCOPE indisputably invoked the validation statutes by pleading them in its complaint, by seeking the trial court's permission to publish the requisite constructive notice required by those statutes, and by informing the court that it gave that notice, whether SCOPE is estopped from contesting the applicability of the validation statutes comes down to whether that contest amounts to a dispute over the court's subject matter jurisdiction.

The validation statutes confer in rem jurisdiction upon a court. (Code Civ. Proc., § 860.) As our Supreme Court held over 125 years ago, in rem jurisdiction attaches only if: (1) the court "ha[s] the authority to determine the subject-matter of the controversy; and (2) the court "ha[s] jurisdiction over the *thing* proceeded against as a defendant." (*Kearney v. Kearney* (1887) 72 Cal. 591, 594 (*Kearney*).) The first prerequisite looks to a court's statutory authority to act (*ibid.*), while the second looks to the propriety of the notice (*id.* at p. 595). Courts have applied this same framework to in rem jurisdiction under the validation statutes: There is subject matter jurisdiction to entertain a validation proceeding only if there is a statutory basis for that jurisdiction *and* if the party seeking to invoke the validation procedures subsequently perfects that jurisdiction by providing the proper type of constructive notice. (*San Diegans for Open Government v. City of San Diego* (2015) 242 Cal.App.4th 416, 428 ["'[f]ailure to publish a summons in accordance with the statutory requirements deprives the court of jurisdiction over "all interested parties" [citation], which deprives the court of the power to rule upon the matter'"]; *Katz v. Campbell Union High School Dist.* (2006) 144 Cal.App.4th 1024, 1032 ["[t]he only way for the court to acquire jurisdiction over the matter is to ensure that notice is given to all interested persons so that the resulting judgment can be conclusive as against them"]; cf. *Arnold v. Newhall County Water Dist.* (1970) 11 Cal.App.3d 794, 799-800 [improper constructive notice; court lacks subject matter jurisdiction]; accord, *Bayle-Lacoste & Co. v. Superior Court* (1941) 46 Cal.App.2d 636, 642-643 [in an in rem condemnation action, notice "vest[s]" jurisdiction].) Constructive notice alone is not enough to confer subject matter jurisdiction. If it were, a party could compel a court to

13

issue a validation ruling merely by giving constructive notice of its complaint, even if its complaint fell outside of any validation statute; such rogue "validation" actions would eviscerate the Legislature's careful effort to specifically delimit when these proceedings are applicable.

Newhall and Valencia counter that allowing SCOPE to retreat from its initial position will empower it to do an "end run" around the validation statutes. We disagree. To be sure, SCOPE is still able to challenge the Agency's actions in this case through a writ of mandate. But this does not offend the validation statutes because (1) the validation statutes by their terms do not apply, and (2) a writ of mandate relies upon the court's in personam jurisdiction (*Hills for Everyone*, *supra*, 105 Cal.App.3d at p. 467), not its in rem jurisdiction (see *Kearney*, *supra*, 72 Cal. at p. 59), and thus any judgment from the in personam writ of mandate binds only the parties to the litigation, not the world.

Consequently, we conclude that the validation statutes' shorter deadline to file a notice of appeal does not apply, and that SCOPE's notice of appeal is timely.

## II. Merits

### A. *Is the Agency violating Water Code section 12944.7 and its enabling act?*

Under Water Code section 12944.7, a public agency that is limited by its enabling act "to the wholesale distribution of water" may sell water at retail only if (1) its enabling act otherwise permits, or (2) the agency has a "written contract" with a water retailer that is either a "public entity water purveyor" or a "water corporation" regulated by the Public Utilities Commission. (§ 12944.7, subd. (b).) Here, the Agency's enabling act limits the agency to "provid[ing], sell[ing] and deliver[ing] . . . water *at wholesale only*." (Stats. 1986, ch. 832, § 5, p. 2843, Deering's Ann. Wat.—Uncod. Acts (2008 ed.) Act 130, § 15, italics added.) What is more, the parties stipulated below that the exception in the Agency's enabling act for selling water at retail (in the territory once serviced by Santa Clarita Water District) does not apply here, and that the Agency has no written contracts with Valencia that would fit within section 12944.7's second exception. Consequently, whether the Agency is currently violating section 12944.7 depends

14

entirely on whether *Valencia* is selling water at retail or whether *the Agency* is doing so using Valencia as its alter ego. The trial court found that Valencia was not the Agency's alter ego, and our task, as noted above, is to review that finding for substantial evidence.[4] (*Las Palmas Associates*, *supra*, 235 Cal.App.3d at p. 1248.)

### 1. Did the trial court properly refuse to consider extra-record evidence?

Before undertaking substantial evidence review, we first address SCOPE's argument that our analysis should include four items of evidence that the trial court refused to consider—namely, the raw audiotape and uncertified transcripts, prepared by SCOPE members, from the Agency's board's December 12 and December 19 meetings. We conclude that the court's refusal to consider this evidence was appropriate for two reasons.

First, the trial court properly refused to consider this evidence because it is outside the administrative record. Agency actions can fall into one of two broad categories: (1) "quasi-judicial" actions, where the agency settles the rights of the parties before it as to past transactions; and (2) "quasi-legislative" actions, where the agency exercises its "discretion governed by considerations of the public welfare" as to prospective events or actions. (*Wilson v. Hidden Valley Municipal Water* (1967) 256 Cal.App.2d 271, 279-280.) A public agency's decision to initiate eminent domain proceedings and to settle those proceedings in a settlement agreement are quasi-legislative because they require the agency to consider and balance policy concerns. (See *Redevelopment Agency v. Rados*

---

**4** For the first time at oral argument, SCOPE requested a reversal and remand so it can propound discovery to prove that the Agency is *now* operating Valencia as its alter ego—irrespective of whether substantial evidence supports the trial court's ruling that the Agency's acquisition of Valencia did not render Valencia the Agency's alter ego. We deny this request. Not only is it procedurally improper (*Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 232, fn. 6 ["[w]e need not consider points raised for the first time at oral argument"]), SCOPE's request is also inconsistent with the allegations in its operative complaint alleging alter ego status solely by virtue of the acquisition and with its earlier stipulation not to "propound any further requests for discovery in this matter."

15

*Bros.* (2001) 95 Cal.App.4th 309, 316 [eminent domain reviewed under standard of review for quasi-legislative actions]; Code Civ. Proc. § 1245.245, subd. (a)(3) [resolution of necessity that precedes eminent domain action must be based on considerations of the "public interest"]; *Joint Council of Interns & Residents v. Board of Supervisors* (1989) 210 Cal.App.3d 1202, 1211 [contracting "requires an exercise of discretion"].) Judicial review of quasi-legislative agency actions is generally confined to the record that was before the agency. (*Shapell Indus., Inc. v. Governing Board* (1991) 1 Cal.App.4th 218, 233 (*Shapell*); see *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 573 ["a court generally may consider only the administrative record in determining whether a quasi-legislative decision was supported by substantial evidence"]; cf. *Hothem v. City* (1986) 186 Cal.App.3d 702, 705 [allowing for remand for consideration of extra-record evidence in a quasi-judicial proceeding].) This rule is consistent with substantial evidence review generally, and ensures that courts appropriately defer to the agency's expertise and its role as part of the separate and coequal executive branch. (*Western States Petroleum*, at pp. 569-573.) The only exceptions, when extra-record evidence will be admitted, are when that evidence "provide[s] background information regarding the quasi-legislative agency decision, . . . establishe[s] whether the agency fulfilled its duties in making the decision, or assist[s] the trial court in understanding the agency's decision." (*Outfitter Properties, LLC v. Wildlife Conservation Bd.* (2012) 207 Cal.App.4th 237, 251 (*Outfitter Properties*).)

SCOPE contends that this rule against the consideration of extra-record evidence does not apply when a party is seeking to challenge the agency's action as ultra vires (that is, beyond its statutory authority); it also argues that *Outfitter Properties*, *supra*, 207 Cal.App.4th 237, supports its position. SCOPE is wrong on both counts. The limitation on extra-record evidence applies even when a party asserts that the agency "acting in its quasi-legislative capacity has exceed its authority." (*Shapell*, *supra*, 1 Cal.App.4th at p. 233.) Moreover, the exceptions outlined in *Outfitter Properties* do not make "extra-record evidence . . . admissible to contradict evidence upon which the

16

administrative agency relied in making its quasi-legislative decision."
(*Outfitter Properties*, at p. 251.)

Second, even if the trial court could have considered this extra-record evidence, the court acted within its discretion in deciding not to admit the incomplete audio tapes and their uncertified transcripts. We review a trial court's decision to exclude evidence for an abuse of discretion. (*People v. Alvarez* (1996) 14 Cal.4th 155, 207.) In deciding whether a party has laid an adequate foundation for a recording, a court is to look to whether the recording is "accurate and complete." (E.g., *People v. Patton* (1976) 63 Cal.App.3d 211, 220; Evid. Code, §§ 1401 & 1413; *People v. Williams* (1997) 16 Cal.4th 635, 662.) In admitting a transcript, a court is to look to its accuracy and whether it is certified. (*Kuehn v. Carlos* (1939) 32 Cal.App.2d 295, 298.) In this case, the court had evidence that at least one of the audio tapes was incomplete, and that both transcripts were uncertified. This is a sufficient basis for refusing to admit them.

SCOPE argues that the Agency did not comply with its discovery obligations before the trial court, did not properly respond to a Public Records Act request (Gov. Code, § 6250 et seq.), and did not inform SCOPE that its board's secretary regularly audio taped meetings to use in preparing official minutes. However, these arguments have no bearing on the propriety or admissibility of SCOPE's extra-record evidence and accordingly do not alter our analysis.

### 2. Does substantial evidence support the trial court's finding that Valencia is not the Agency's alter ego?

"It is fundamental that a corporation is a legal entity that is distinct from its shareholders." (*Grosset v. Wenaas* (2008) 42 Cal.4th 1100, 1108.) Part and parcel of this general principle is that "a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." (*United States v. Bestfoods* (1998) 524 U.S. 51, 61.) However, where a parent corporation (or, for that matter, anyone) that owns all of a subsidiary's stock operates that subsidiary in a manner that renders the subsidiary merely an alter ego of its parent (and a ghost of its former, independent self), courts can pierce the so-called "corporate veil" and

17

treat the two as one.  (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 538 (*Sonora Diamond*).)

In assessing whether to treat a subsidiary as the alter ego of its parent corporation (or its individual owner(s)), courts must assess whether (1) there is "such unity of interest and ownership that the separate personalities of the [subsidiary] corporation and [its parent corporation or individual owner] no longer exist" and (2) "if the acts are treated as those of the [subsidiary] alone, an inequitable result will follow."  (*Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 300; *CADC/RADC Venture 2011-1 LLC v. Bradley* (2015) 235 Cal.App.4th 775, 788-789 (*CADC/RADC*).)  An inequitable result follows when the corporate form is used "to perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose."  (*Sonora Diamond*, *supra*, 83 Cal.App.4th at p. 538.)  "To put it in other terms, the plaintiff must show 'specific manipulative conduct' by the parent toward the subsidiary which 'relegate[s] the latter to the status of merely an instrumentality, agency, conduit or adjunct of the former.'"  (*Laird v. Capital Cities/Abc* (1998) 68 Cal.App.4th 727, 742, quoting *Institute of Veterinary Pathology, Inc. v. California Health Laboratories, Inc.* (1981) 116 Cal.App.3d 111, 119-120; *Las Palmas Associates*, *supra*, 235 Cal.App.3d at p. 1249.)  As these definitions indicate, treating one corporation as the alter ego of another is "'an extreme remedy, [to be] sparingly used'" (*Hasso v. Hapke* (2014) 227 Cal.App.4th 107, 155 (*Hasso*)) and is to be "approached with caution" (*Las Palmas Associates*, at p. 1249).  This heavy burden rests on the shoulders of the party seeking to pierce the corporate veil.  (*Mid-Century Ins. Co. v. Gardner* (1992) 9 Cal.App.4th 1205, 1212-1213.)

In evaluating the two requirements of the alter ego doctrine, courts look to the totality of the circumstances bearing on the relationship between the parent and its subsidiary.  (*Hasso*, *supra*, 227 Cal.App.4th at p. 155; *Greenspan v. LADT LLC* (2010) 191 Cal.App.4th 486, 513; *Sonora Diamond*, *supra*, 83 Cal.App.4th at p. 539.)  Those circumstances include, but are not limited to (1) whether the parent and subsidiary commingle funds and other assets, (2) whether the parent has represented to third parties

18

that it is liable for the subsidiary's debts, (3) whether the parent owns 100 percent of the subsidiary's stock, (4) whether the parent and subsidiary use the same offices and same employees, (5) whether the subsidiary is used as the "mere shell or conduit" for the affairs of the parent, (6) whether the subsidiary is inadequately capitalized, (7) whether the parent or subsidiary disregard corporate formalities such as holding board meetings, keeping corporate records, and acting through votes of the corporate board, (8) whether the parent and subsidiary commingle their corporate records, (9) whether the parent and subsidiary have "identical directors and officers," and (10) whether the parent has diverted the subsidiary's assets to the parent's uses. (*Hasso*, at p. 155; *Greenspan*, at pp. 512-513.)

The trial court found that the Agency was not operating Valencia as its alter ego because the Agency's ownership of all of Valencia's stock and its appointment of three Agency employees to Valencia's five-member board of directors was insufficient to prove that the Agency was treating Valencia as a mere conduit or instrumentality. Substantial evidence supports this finding. In evaluating whether evidence is substantial, we ask whether a "'rational trier of fact could find [the evidence] to be reasonable, credible, and of solid value'" and do so while "'view[ing] the evidence in the light most favorable to the [decision].'" (*San Diegans for Open Government v. City of San Diego* (2016) 245 Cal.App.4th 736, 740.) The Agency's ownership of Valencia's stock is of no moment. That is because, under California law, a parent corporation or an individual's ownership of a subsidiary is *necessary* for application of the alter ego doctrine (*CADC/RADC, supra*, 235 Cal.App.4th at p. 789), but it is not *sufficient* (*Leek v. Cooper* (2011) 194 Cal.App.4th 399, 415; *Meadows v. Emett & Chandler* (1950) 99 Cal.App.2d 496, 499; *Hollywood Cleaning & Pressing Co. v. Hollywood Laundry Service, Inc.* (1932) 217 Cal. 124, 129; *Erkenbrecher v. Grant* (1921) 187 Cal. 7, 11). And although three of Valencia's five directors are Agency employees, this falls far short of showing the two corporations have "identical directors and officers." At most, it shows "some common personnel," which is not enough. (*Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1269, 1285; cf. *Borun Bros. v. Department of Alcohol Beverage Control*

19

(1963) 215 Cal.App.2d 503, 508-509 [alter ego applies where two corporations have "interlocking directorships"]; *Thomson v. L.C. Roney & Co.* (1952) 112 Cal.App.2d 420, 428-429 [same].)  None of the other factors is present.[5]

SCOPE levels three attacks at the trial court's analysis.  First, SCOPE argues that the settlement agreement contemplates a future merger between the Agency and Valencia, which in SCOPE's view indicates a wrongful intent.  We disagree.  The agreement places a 75-day moratorium on implementing any resolution to absorb Valencia into the Agency "*should*" the Agency's board authorize such a merger. Although the agreement does not forever declare any and all mergers to be impossible, it also does not dictate a merger; this provision addresses at most a possible contingency. Second, SCOPE cites several cases in which courts have applied the alter ego doctrine. (See *Las Palmas Associates*, *supra*, 235 Cal.App.3d 1220; *H.A.S. Loan Service, Inc. v. McColgan* (1943) 21 Cal.2d 518; *Say & Say, Inc. v. Ebershoff* (1993) 20 Cal.App.4th 1759.)  But, as even *H.A.S. Loan Service* acknowledges, "each case must rest upon its special facts, and such determination is peculiarly within the province of the trier of fact." (*H.A.S. Loan Service*, at p. 523.)  The cases SCOPE cites involve very different facts from those present here.  (*Las Palmas Associates*, at pp. 1249-1251 [affirming finding that two sister corporations liable were alter egos of one another based on undercapitalization and guarantees by one corporation for the other]; *H.A.S. Loan Service*, at pp. 521-523 [affirming finding of alter ego when two corporations worked in tandem to make loans that circumvented the fees charged to national banks for such loans]; *Say & Say*, at pp. 1767-1769 [affirming finding that law firm was alter ego of attorney for purposes of evading vexatious litigant status].)  More importantly, the appellate courts in those three cases *affirmed* the trial courts' findings of alter ego after

---

[5]    Valencia, Newhall, and Stevenson Ranch urge us to examine, as part of our alter ego analysis, whether the parent has "taken over performance of the subsidiary's day-to-day operations" (*Sonora Diamond*, *supra*, 83 Cal.App.4th at p. 542, italics omitted), but that test is relevant to whether the subsidiary is the *agent* of the parent (*id.* at pp. 540-542).  The question of agency is distinct from the question of alter ego.  (*Id.* at p. 540 [noting that "the two concepts are different and must be evaluated independently"].)

viewing the evidence in the light most favorable to those findings; here, we do the same in affirming the trial court's finding against alter ego. Lastly, SCOPE asserts that the Agency's acquisition of Valencia is enabling it to achieve an inequitable result because it is now able to "circumvent a statute"—namely, Water Code section 12944.7 and its restrictions on the retail sale of water. Even if we assume for the sake of argument that a transaction that avoids application of a statute amounts, without more, to an attempt to "circumvent" it, this consideration is just one of many that, for the reasons noted above, does not undercut the substantial evidence that the Agency and Valencia have maintained separate corporate identities.

### B. Is the Agency violating article XVI, section 17 of the California Constitution by owning Valencia's stock?

Article XVI, section 17 of the California Constitution provides, in pertinent part, that "[t]he State shall not in any manner loan its credit, nor shall it subscribe to, or be interested in the stock of any company, association, or corporation, except that the State and each political subdivision, district, municipality, and public agency thereof is hereby authorized to acquire and hold shares of the capital stock of any mutual water company or corporation when the stock is so acquired or held for the purpose of furnishing a supply of water for public, municipal or governmental purposes; and the holding of the stock shall entitle the holder thereof to all of the rights, powers and privileges, and shall subject the holder to the obligations and liabilities conferred or imposed by law upon other holders of stock in the mutual water company or corporation in which the stock is so held." (Cal. Const., art. XVI, § 17 (section 17).)[6]

SCOPE argues that this provision prohibits the Agency from acquiring and owning Valencia's stock because Valencia is not a "mutual water company or corporation." This argument requires us to answer two questions: (1) does section 17's general prohibition apply when the public agency's ownership of stock does not amount

---

[6] This provision has additional language dealing with "public pension or retirement system[s]," but this language is not relevant to the issues presented in this case.

21

to an extension of credit?; and (2) because it is undisputed that Valencia is a corporation but not a "mutual water company," does section 17's exception for ownership of stock in any "mutual water company or corporation" apply only to a corporation that is a "mutual water company" or instead to *any* "corporation?"

These questions require us to construe section 17. "In doing so, '"our fundamental task is 'to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute.'"'" (*Lee v. Hanley* (2015) 61 Cal.4th 1225, 1232; *Riverside County Sheriff's Dept. v. Stiglitz* (2014) 60 Cal.4th 624, 630 ["[i]n answering this question of statutory interpretation, our goal is to effectuate the Legislature's intent"].) Our starting place is the provision's text because it is "'"'generally . . . the most reliable indicator of legislative intent'"'" (*Lee*, at p. 1232), although "'"[w]e may reject a literal construction'"'" if it is "'"'contrary to the legislative intent apparent in the statute'"'" (*Stiglitz*, at p. 630; *Provigo Corp. v. Alcoholic Beverage Control Appeals Bd.* (1994) 7 Cal.4th 561, 566-567 ["'the "plain meaning" rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose'"]; *Santa Ana Unified School Dist. v. Orange County Dev. Agency* (2001) 90 Cal.App.4th 404, 410 (*Santa Ana Unified School Dist.*) ["'[t]he legislative purpose will not be sacrificed to a literal construction of any part of the statute'"].) If the text is unambiguous and comports with the statute's purpose, we stop there. (*Lee*, at pp. 1232-1233.) However, if the statute's text "permits more than one interpretation . . ., we 'may consider other aids, such as the statute's purpose, legislative history, and public policy'" (*Ardon v. City of Los Angeles* (2016) 62 Cal.4th 1176, quoting *Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737) as well as the general canons of statutory construction (*Stiglitz*, at p. 630). These rules of construction apply to provisions of our Constitution as well as statutes (e.g., *Provigo*, at p. 567), and in that context, we may look to ballot pamphlets underlying adoption of those constitutional provisions as part of the provision's legislative history (*People ex rel. Feuer v. Nestdrop, LLC* (2016) 245 Cal.App.4th 664, 677).

At the outset, Valencia asserts that we need not determine whether section 17 prohibits the Agency from owning stock in a retail water purveyor because that question was already resolved in *Klajic I*, *supra*, 90 Cal.App.4th 987. Although the Court of Appeal in *Klajic I* noted that it did "not disagree with the Agency that it was lawfully empowered to acquire the [Santa Clarita] Water Company (Cal. Const., art. XVI, § 17)" (*Klajic I*, at p. 1000), the question presented in *Klajic I* was whether the Agency's absorption of the Santa Clarita Water District meant that the Agency and the District had become "alter egos" of one another (*id.* at pp. 1000-1001). The constitutional question we face in this case was neither squarely presented nor analyzed. Because ""cases are not authority for propositions not considered"" (*Silverbrand v. County of Los Angeles* (2009) 46 Cal.4th 106, 127, quoting *In re Marriage of Cornejo* (1996) 13 Cal.4th 381, 388), *Klajic I* did not resolve the issue and we proceed to do so.

**1.      Does section 17's general prohibition apply?**

Section 17 prohibits "[t]he State . . . in any manner [from] loan[ing] its credit" or "subscrib[ing] to, *or be[ing] interested in the stock of any company, association or corporation.*" (Cal. Const., art. XVI, § 17, italics added.) Although the italicized language, standing alone, would seem to prohibit any and all stock ownership by the state, Valencia argues that it must be read in the context of the whole sentence—which is aimed at the far narrower evil of the state loaning its good name and credit to private companies. Because "a word takes its meaning from the company it keeps" (*Blue Shield of California Life & Health Ins. Co. v. Superior Court* (2011) 192 Cal.App.4th 727, 740; *Grafton Partners v. Superior Court* (2005) 36 Cal.4th 944, 960 [describing the canon of statutory construction known as *noscitur a sociis*]), Valencia contends that section 17's prohibition does not apply when the state has purchased *all* of a private company's stock and is therefore no longer lending its credit to a private entity.

For support, Valencia cites *General Engineering & Dry Dock Co. v. East Bay Municipal Utility Dist.* (1932) 126 Cal.App. 349 (*General Engineering*). There, a utility district bought all of a water company's stock and then levied a tax to recoup the cost of doing so. (*Id.* at pp. 352-357.) Several unhappy taxpayers challenge the tax, in part on

23

the ground that acquisition was unconstitutional under section 17's predecessor, which provided in pertinent part that "'[t]he legislature shall have no power to give or to lend, or to authorize the giving or lending, of the credit of the State, or of any . . . subdivision of the State'" and "'shall not have power to authorize the State, or any political subdivision thereof, to subscribe for stock, or to become a stockholder in any corporation whatever.'" (*Id.* at p. 357, quoting Cal. Const., art. IV, § 31 (1880).) The Court of Appeal rejected the constitutional challenge. The court reasoned: "Where there is such an admitted situation of 'purchase' and 'sole ownership', there is no 'giving or lending of credit' within the meaning of any such prohibitory provisions. The situation contemplated by the prohibitory measure is not present; for the 'purchase of all the property' and the 'sole ownership' of all the property preclude the conclusion that there has been any joinder with another as an interested party or aided party or that what was done in the interest or for the benefit of anyone other than the 'purchaser' and 'owner.'" (*Id.* at p. 358; see also *Carpenter v. Pacific Mutual Life Ins. Co.* (1937) 10 Cal.2d 307, 339-340 [section 17's predecessor does not apply when state, acting as conservator, acquires stock].)

*General Engineering* appears to be directly on point. Although, as we discuss below, section 17 has evolved over the decades, its prohibition of stock ownership has always been—and continues to be—married to its prohibition against the lending of credit. Where, as here, the state (or its agency) has acquired all of the stock in a company, association or corporation, it is not lending its credit to the corporation or the corporation's other owners; the state *owns* it. In such instances, section 17's prohibition does not apply.

SCOPE resists the force of this analysis with three arguments. First, it contends that *General Engineering* is factually distinguishable because the public agency in that case acquired not only the water company's stock, but also its assets and debts. This is true (*General Engineering*, *supra*, 126 Cal.App. at p. 357), but was not germane to the court's reasoning or result, which turn on the public agency's purchase and ownership of the water company's stock (*id.* at p. 358). Second, SCOPE asserts that *General Engineering* is legally distinguishable (a) because it interprets article IV, section 31 of the

24

California Constitution, which deals with limits on the Legislature's power to authorize the state to acquire stock, (b) because the voters amended section 31 by adding section 31b a few weeks after *General Engineering* was decided, and (c) because section 31b "could have been a reaction" to *General Engineering*. As described more fully below, the legislative history refutes SCOPE's assertions. Section 31 of article IV is one of two provisions from which the current version of article XVI, section 17 is derived, and the enactment of section 31b by the voters soon after *General Engineering* was handed down was entirely consistent with *General Engineering* because it created a further exception to section 31's near-absolute bar on stock ownership. Lastly, SCOPE argues that the link *General Engineering* forges between the prohibition on stock ownership and the prohibition of lending credit is refuted by an excerpt from the 1880 floor debate about the predecessor to section 31; in that debate, the proponent explains that the provision "prohibits [the state] owning stock in a corporation" and from "pledging credit . . . [i]n aid of any corporation." (Debates, Constitutional Convention (Sept. 28, 1878) p. 443 at <https://babel.hathitrust.org/cgi/pt?id=hvd.li12jq; view=1up;seq=447;size=150> [as of July 22, 2016].) We may consider this exchange as part of the provision's legislative history (*Henson v. C. Overaa & Co.* (2015) 238 Cal.App.4th 184, 198), but disagree with SCOPE that it is inconsistent with *General Engineering's* reasoning or holding. In sum, SCOPE's arguments do not persuade us that section 17's stock ownership bar applies to a public agency's acquisition of *all* of the stock of a company, association or corporation.

> **2.    Does section 17's exception allowing for ownership of stock in a "mutual water company or corporation" apply?**

Even if section 17's bar on stock ownership applied, section 17 excepts stock ownership in "any mutual water company or corporation when the stock is so acquired or held for the purpose of furnishing a supply of water for public, municipal or governmental purposes." (Cal. Const., art. XVI, § 17.) A "mutual water company" is a company organized to deliver water, at cost, to its shareholders and *only* its shareholders. (Pub. Util. Code, § 2725; Corp. Code, § 14300.) Because Valencia is not a "mutual water

25

company," whether the Agency can avail itself of this exception turns on whether "any mutual water company or corporation" means "any mutual water company or *mutual water* corporation" or "any mutual water company or *any* corporation." SCOPE urges the former interpretation; respondents urge the latter. In resolving this dispute, we examine the text of the provision as well as its legislative history and purpose.

### a. Text

The text of section 17's exception points to the conclusion that a state may own stock in "any corporation" as long as it is doing so, as the section mandates, "for the purpose of furnishing a supply of water for public, municipal or governmental purposes." (Cal. Const., art. XVI, § 17.) A "mutual water company" is statutorily defined to include all types of companies, including corporations. (Pub. Util. Code, § 2725 [defining "mutual water company" to include "any private corporation or association" otherwise meeting the definition]; Corp. Code, § 14300 [defining "mutual water company" to include "[a]ny corporation" otherwise meeting the definition].) Because "mutual water company" already means "mutual water corporation," section 17's inclusion of the additional words "or corporation" must mean "or *any* corporation"; otherwise, those additional words serve no function and are unnecessary surplusage. "Constitutional provision[s] should be interpreted so as to eliminate surplusage." (*Voters for Responsible Retirement v. Board of Supervisors* (1994) 8 Cal.4th 765, 772.)

SCOPE offers five arguments against this construction of section 17's text. First, SCOPE contends that the drafters used the words "company or corporation" to ensure that the exception reached unincorporated associations. This contention overlooks that the word "company" already includes unincorporated associations. (E.g., *Law v. Crist* (1940) 41 Cal.App.2d 862, 865 ["'[t]he term [association] is often used as synonymous with "company" or "society"'"]; Pub. Util. Code, § 2725 ["mutual water company" reaches "any private . . . association" otherwise qualifying].) This contention also fails to explain why "or corporation" would be added.

Second, SCOPE argues that if we construe "corporation" in section 17 to mean "*any* corporation," then we would render the phrase "mutual water company"

26

unnecessary surplusage because some "corporations" are "mutual water companies." This argument ignores that the phrase "mutual water company" also includes unincorporated associations; the phrase "mutual water company" is accordingly not surplusage because it assures that stock ownership in mutual water *associations* is exempt.

Third, SCOPE contends that we must construe the terms "company" and "corporation" as being synonymous because section 17's general prohibition uses the two terms synonymously when it prohibits a public agency from having an "interest[] in the stock of any company, association, or corporation" (Cal. Const., art. XVI, § 17), and because the words must be given the same synonymous meaning when they are part of section 17's exception. We disagree. As we discuss above, section 17's exception uses the phrase "mutual water company or corporation," and "mutual water company" as a longstanding term of art that specifically includes corporations. By contrast, section 17's general prohibition just uses the word "company" alone, as part of the phrase "company, association, or corporation." Whether or not the generic term "company" is synonymous with the generic term "corporation" does not shed any light on the overlap of the two words when one of them ("company") is used as part of a phrase ("mutual water company") that incorporates, and thereby invokes, a well-defined term of art.

Fourth, SCOPE asserts that the phrase "company or corporation" is just a generic catch-all phrase used in a variety of different statutes to mean "company, which may be a corporation";[7] what is more, says SCOPE, that phrase is often unnecessary surplusage in those other statutes because those statutes list "person," "company" or "corporation"

---

[7]    (See Pub. Resources Code, § 7303.5; Veh. Code, § 9805; Pen. Code, §§ 30715, subd. (a)(1) & § 30720, subd. (a); Rev. & Tax Code, § 24359, subd. (d); Ed. Code, § 69980, subd. (i); Bus. & Prof. Code, § 3109; Civ. Code, §§ 798.37, 800.47 & 1747.03, subd. (b); Food & Agr. Code, § 41551; Sts. & Hy. Code, §§ 30106 & 30107.)

27

together,[8] and the term "person" usually includes "companies" and "corporations" (e.g., Civ. Code, § 14; Evid. Code, § 175).  However, the use of "company or corporation" in other contexts is beside the point.  Those three words are only *part* of the phrase we are tasked with construing here; whether those three words are unnecessary in other contexts is thus irrelevant.

Lastly, SCOPE argues that we must construe the phrase "company or corporation" in section 17 in pari materia with Government Code section 7513.6 and Insurance Code section 1241.2.  """"It is an established rule of statutory construction that similar statutes should be construed in light of one another [citations], and that when statutes are *in pari materia* similar phrases appearing in each should be given like meanings."""" (*People v. Tran* (2015) 61 Cal.4th 1160, 1167-1168, quoting *People v. Lamas* (2007) 42 Cal.4th 516, 525.)  Government Code section 7513.6 addresses investments in the Sudan and Insurance Code section 1241.2 addresses investments in Iran.  They have nothing to do with investments in mutual water companies or the concerns underlying section 17.  They are not in pari materia, and are irrelevant.

### b.  *Legislative history*

Section 17 traces its lineage back to the 1880 version of our Constitution.  At that time, the bar against state ownership of stock was lodged in two different provisions: Article IV, section 31 limited our Legislature's power by providing that "[t]he Legislature. . . shall not have power to authorize the State, or any political subdivision thereof, to subscribe for stock, or to become a stockholder in any corporation whatever" (Cal. Const., art. IV, § 31 (1880)), and article XII, section 13 directly prohibited such ownership by providing that "[t]he State shall not in any manner loan its credit, nor shall

---

[8]    (See Pub. Resources Code, § 7303.5; Pen. Code, §§ 30715, subd. (a)(1) & 30720, subd. (a); Bus. & Prof. Code, § 3109; Civ. Code, §§ 798.37, 800.47 & 1747.03, subd. (b); Food & Agr. Code, § 41551.)

it subscribe to, or be interested in the stock of any company, association, or corporation" (art. XII, § 13 (1880)).[9]

Over the next century, the voters enacted five exceptions to the direct prohibition. In 1914, the voters amended article IV, section 31 to directly authorize irrigation districts to acquire stock in "any foreign corporation which is the owner of" an "international water system" if doing so was "for the purpose of acquiring the control of [that] . . . system necessary for its use and purposes." (Cal. Const., art. IV, § 31 (1914).) In 1932, the voters adopted a new article IV, section 31b, which directly authorized the City of Escondido to acquire the stock of "any mutual water company or corporation, when such stock is so acquired or held for the purpose of furnishing a supply of water for public or municipal purposes or for the use of the inhabitants of the city." (Art. IV, § 31b (1932).) The associated ballot pamphlet explained that "[t]he purpose of this amendment [was] to allow the City of Escondido to own stock in a mutual water company." Two years later, the voters added article IV, section 31c and expanded the exception for the City of Escondido to any and all cities "of the fifth or sixth class." (Art. IV, § 31c (1934).) In 1940, the voters enacted article IV, section 31d to expand the exception further to "the State." (Art. IV, § 31d (1940).) The ballot pamphlet explained that the state was facing a "serious shortage of water supply" and that "[f]requently the most feasible means for securing the necessary water is and will be to acquire stock in a mutual water company." Finally, in 1956, the voters further expanded the exceptions recognized in sections 31b, 31c, and 31d of article IV to reach any public agency in the state; moved this consolidated exception to article XII, section 13, which was the provision that directly regulated stock ownership by public agencies; and then repealed sections 31b, 31c and 31d of article IV. The ballot pamphlet explained that this provision would "create an exception to [the general bar of stock ownership] insofar as mutual water

_____

[9]  SCOPE requested that we take judicial notice of the legislative history of section 17. We grant that motion. (Evid. Code, §§ 452 & 459.)

29

companies are concerned." This provision was later moved to section 17 without any substantive modification.[10]

We draw three conclusions from this legislative history. First, this history shows a steady expansion in the circumstances under which public agencies can acquire stock in companies in order to provide water to the public they serve. Second, this expansion has focused primarily—but not exclusively—on allowing public agencies to acquire stock in mutual water companies; although most of the exceptions have dealt with mutual water companies, the very first exception reached *any* foreign corporation. Third, the history is silent on why the phrase "or corporation" was added to the phrase "mutual water company or corporation."

### c.    *Purpose*

The reason for section 17's exception appears both in its text and its legislative history. The text permits public agencies to own stock in a "mutual water company or corporation," but only if that ownership "is . . . for the purpose of furnishing a supply of water for public, municipal or governmental purposes." (Cal. Const., art. XVI, § 17.) The legislative history reinforces that the function of this exception is providing "the

---

**10**    The provision prohibiting the Legislature from authorizing public ownership of corporate stock remained intact, and was moved to article XVI, section 6 in 1974. (Cal. Const., art XVI, § 6.) For the first time in its reply brief on appeal, SCOPE argues that the Agency's acquisition of Valencia's stock would have violated this provision had our Legislature tried to authorize it. This argument is procedurally improper, irrelevant and wrong. It is not properly before us because SCOPE never mentioned section 6 before the trial court or in its opening brief on appeal; to allow SCOPE to raise it at this late stage, when the Agency and Valencia have no further opportunity to respond, is patently unfair. (*People v. Rangel* (2016) 62 Cal.4th 1192, 1218-1219.) It is irrelevant because the factual predicate for the relevance of this provision—namely, that the Legislature authorized the stock acquisition in this case—never happened. And it is wrong because the limits on legislative power set forth in section 6 do not apply to stock ownership specifically authorized by article XVI, section 17; to hold otherwise is to abrogate section 17. Our job is to give effect to all provisions of our Constitution, not to nullify them. (See *McWilliams v. City of Long Beach* (2013) 56 Cal.4th 613, 627 [courts have a "duty to harmonize constitutional provisions where possible"].)

30

most feasible means for securing" the "water" "necessary" to provide for constituents during a "serious shortage of water supply."

Although it is a close question, we conclude that section 17 permits a public agency to acquire stock in *any* corporation for the purpose of furnishing a supply of water. We so conclude for two reasons. First, this interpretation better furthers the purpose of section 17's exception—namely, to provide a ready means for public agencies to secure water for the public they serve. (*Santa Ana Unified School Dist.*, *supra*, 90 Cal.App.4th at p. 410 ["[w]here a statute is reasonably susceptible to two interpretations, we must embrace the one that best effectuates the legislative purpose"].) If we limited public agencies to acquiring the stock of mutual water companies, we would be cutting off a viable supply of water. Although a public agency would, under the narrower construction, still be able to buy water from a corporation that was not a mutual water company, being a customer is not an adequate substitute for being a stockholder given the economies of scale and potential for control and coordination that come with acquisition but not with purchase.

Second, because section 17's exception is limited by its plain terms to corporations that supply water, our conclusion that section 17 permits stock ownership in "any" corporation means only that the exception reaches nonmutual water corporations as well as "mutual water companies." This is of little consequence because what differentiates the two is how they are regulated. Mutual water companies are not regulated by the Public Utilities Commission. (Pub. Util. Code, § 2705; *Yucaipa Water Co. v. Public Utilities Com.* (1960) 54 Cal.2d 823, 826, 828-829; *J.M. Howell Co. v. Corning Irrigation Co.* (1918) 177 Cal. 513, 519.) That is because they are self-regulated: The only people who receive their water are their shareholders, and those shareholders are viewed as having ample legal remedies available to them and their ability to engage in such self-help renders agency oversight unnecessary. (*Erwin v. Gage Canal Co.* (1964) 226 Cal.App.2d 189, 195; *Crescent Canal Co. v. Kings County Development Co.* (1941) 43 Cal.App.2d 370, 376-377; *Yucaipa Water Co.*, at p. 830; *Consolidated Peoples Ditch Co. v. Foothill Ditch Co.* (1928) 205 Cal. 54, 63;

31

*Miller v. Imperial Water Co., No. 8* (1909) 156 Cal. 27, 29-30.) Nonmutual water companies are either regulated by the Public Utilities Commission (Pub. Util. Code, §§ 701 & 2703), or by the public agency itself if the company is wholly owned by that agency (Cal. Const., art. XII, § 3). Who is regulating a water company would seem to have no bearing on whether a public agency should be able to own its stock; this is particularly so here, where the Agency's acquisition of Valencia moved Valencia from oversight by one public agency (the Public Utilities Commission) to another (the Agency).

SCOPE argues that our conclusion has been rejected by the Attorney General and by the Public Utilities Commission. In a 1960 opinion, the Attorney General opined that municipal water districts could own stock in a mutual water company. (36 Ops.Cal.Atty.Gen. 141 (1960).) This opinion does not speak to whether the exception in section 17 or its predecessor reaches corporations that are not mutual water companies. In 2014, the Public Utilities Commission concluded that Valencia was no longer subject to its regulation. In the course of its opinion, however, the Commission undertook an analysis into whether the Agency's acquisition of Valencia was valid under section 17. The Commission opined that the acquisition may be unconstitutional because, in its view, section 17 only reached stock ownership in corporations that were also "mutual water companies." In reaching this holding, the Commission determined that the text of section 17's exception was ambiguous, and never examined the purpose behind that exception. As noted above, we have come to different conclusions. Because, and as the Commission acknowledged, its opinion is only persuasive authority (*Greene v. Marin County Flood Control & Water Conversation Dist.* (2010) 49 Cal.4th 277, 290-291), we may conclude that its reasoning is unpersuasive.

32

**DISPOSITION**

The judgment is affirmed.  Respondents are entitled to their costs on appeal.

**<u>CERTIFIED FOR PUBLICATION.</u>**

_____, J.
HOFFSTADT

We concur:

_____, Acting P. J.
ASHMANN-GERST

_____, J.
CHAVEZ